IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:24-CR-00371-2 |
| | § | HOUSTON, TEXAS |
| v | § | TUESDAY, |
| | § | JULY 30, 2024 |
| OSCAR WATTELL (2) | § | 10:11 A.M. TO 12:22 P.M. |

## ARRAIGNMENT AND DETENTION HEARING

BEFORE THE HONORABLE CHRISTINA A. BRYAN
UNITED STATES MAGISTRATE JUDGE


| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| CASE MANAGER: | MELISSA MORGAN |
| COURTROOM ERO: | CHRISTOPHER RODRIGUEZ |

**THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT ORDER.  UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.  General Order 94-15, United States Court, Southern District of Texas.**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § CASE NOS. 4:24-CR-00371-27 |
| | §           4:24-CR-00371-49 |
| v | §           4:24-CR-00371-50 |
| | § HOUSTON, TEXAS |
| DERRICK WASHINGTON (27) | § TUESDAY, |
| CALVIN SKRIVANEK (49) | § JULY 30, 2024 |
| RASHAD DERRICK (50) | § 10:11 A.M. TO 12:22 P.M. |

**ARRAIGNMENT AND DETENTION HEARING**

BEFORE THE HONORABLE CHRISTINA A. BRYAN
UNITED STATES MAGISTRATE JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| CASE MANAGER: | MELISSA MORGAN |
| COURTROOM ERO: | CHRISTOPHER RODRIGUEZ |

**THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.   General Order 94-15, United States Court, Southern District of Texas.**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

3

## **APPEARANCES**:

```
FOR THE UNITED STATES OF        US ATTORNEY'S OFFICE
AMERICA:                        Michael E. Day, Esq.
                                1000 Louisiana Street
                                Suite 2300
                                Houston, TX 77002
                                956-638-5512


FOR DEFENDANT OSCAR             FOREMAN DeGEURIN & DeGEURIN
WATTELL:                        George M. DeGeurin, Jr., Esq.
                                300 Main Street, 3rd Floor
                                Houston, TX 77002
                                713-655-9000


FOR DEFENDANT DERRICK           LAW OFFICE OF THOMAS A. MARTIN
WASHINGTON:                     Thomas A. Martin, Esq.
                                917 Franklin Street
                                Suite 500
                                Houston, TX 77002
                                713-222-0556


FOR DEFENDANT CALVIN            ATTORNEY AT LAW
SKRIVANEK:                      Winifred Akins Pastorini, Esq.
                                440 Louisiana Street
                                Suite 200
                                Houston, TX 77002
                                713-236-7300


FOR DEFENDANT RASHAD            ATTORNEY AT LAW
DERRICK:                        J. Gordon Dees, Esq.
                                5300 Memorial Drive
                                Suite 750
                                Houston, TX 77007
                                713-621-2070


ALSO PRESENT:                   Crista Orphe, Pretrial Services
```

### <u>INDEX</u>

| WITNESSES: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> | VOIR <u>DIRE</u> |
|---|---|---|---|---|---|
| ANTHONY TURNER | | | | | |
| By Mr. Day | 14 | . | . | . | . |
| By Mr. DeGeurin | . | 25 | . | . | . |
| By Mr. Martin | . | 36 | . | . | . |
| By Mr. Dees | . | 44 | . | . | . |
| By Ms. Pastorini | . | 55 | . | . | . |
| | | | | | |
| ADAM HASSAN | | | | | |
| By Mr. Day | 59 | . | . | . | . |
| By Mr. DeGeurin | . | 63 | . | . | . |
| By Mr. Martin | . | 68 | . | . | . |
| By Mr. Pastorini | . | 72 | . | . | . |

| EXHIBITS: | <u>Marked</u> |
|---|---|
| Wattel's Exhibit 1 | 75 |

***

<u>**HOUSTON, TEXAS; TUESDAY, JULY 30, 2024; 10:11 A.M.**</u>

THE COURT:  All right.  We have four detention

hearings in Case 4:24-371.  Are all four hearings going

forward?

MR. DAY:  Yes, Your Honor.  Mike Day for the

Government.

MR. MARTIN:  Tom Martin for Mr. Washington.  Yes,

Judge.

MS. PASTORINI:  Wendy Pastorini for Calvin

Skrivanek, and, yes, Your Honor.

MR. DEES:  And Justin Gordon Dees for Rashad

Derrick, and we're going forward.

THE COURT:  Okay.

MR. DEGEURIN:  And Michael DeGeurin for Mr. Wattell,

and, yes, we are going forward.

THE COURT:  Okay.  All right.  Why don't we do the

arraignments first.

MR. MARTIN:  Do you have a particular -- where you

want to --

THE COURT:  Let's do Wattell, Washington and Derrick

first, and then Skrivanek on the end.

(Pause in the proceedings.)

THE COURT:  All right.  Good morning.  Can I have

all counsel announce your appearances for the Record, please?

MR. DEGEURIN:  Michael DeGeurin for Mr. Wattell.

1          MR. MARTIN:  Tom Martin for Derrick Washington.

2          MR. DEES:  Justin Gordon Dees, D-E-E-S, for Rashad

3    Derrick.

4          MS. PASTORINI:  Wendy Pastorini for Mr. Skrivanek,

5    Calvin Skrivanek.

6          THE COURT:  All right.  Thank you, Counsel.  And all

7    the Defendants are present.

8          Each of you on the day that you appeared for your

9    initial appearance received a copy of the indictment.

10   Correct?

11        (All Defendants respond affirmatively.)

12         THE COURT:  All right.  I'm going to ask everyone to

13   speak up loudly so that you get recorded on the recording

14   that's being made.

15         So I've informed all of you that the maximum

16   statutory penalty for all of the offenses that are charged

17   either as conspiracy to commit wire fraud or wire fraud have

18   the same maximum statutory penalty of up to 20 years in

19   prison, a fine of up to $250,000, up to 3 years on supervised

20   release and a $100 mandatory special assessment per count of

21   conviction.

22         Does everyone understand the maximum statutory

23   penalty for any of the charges that you are charged with in

24   the indictment?

25        (All Defendants respond in the affirmative.)

1        THE COURT:  All right.  Starting with Mr. Wattell,

2    sir, you are charged in Counts 17, 21, 29 and 36.  Those are

3    conspiracy to commit wire fraud charges with the penalty that

4    I just informed you about.  Do you fully understand the

5    conspiracy to commit wire fraud charges, which are violations

6    of 18 US Code Sections 1349 and 1343?

7        DEFENDANT WATTELL:  Yes, ma'am.

8        THE COURT:  You're also charged in Count 47, which

9    is a charge of crimes by or affecting persons engaged in the

10   business of insurance.  The maximum penalty for that crime is

11   up to 5 years in prison, a fine of up to $250,000, and up to 3

12   years on supervised release.  It's also a violation of 18 US

13   Code Section 1033(e)(1)(A) and Section 2, that's alleged to

14   have occurred between November '21 and -- November 2021 and

15   August 2022.

16       Do you understand that charge and the maximum

17   penalty that you face if convicted?

18       DEFENDANT WATTELL:  Yes, ma'am.

19       THE COURT:  All right.  Have you had enough time to

20   talk with your attorney to go over the charges in the

21   indictment?

22       DEFENDANT WATTELL:  Yes, ma'am.

23       THE COURT:  Are you ready to enter your formal plea

24   to the charges in Counts 17, 21, 29, 36 and 47?

25       DEFENDANT WATTELL:  Yes, ma'am.

1          THE COURT:  And how do you plead?

2          DEFENDANT WATTELL:  Not guilty.

3          THE COURT:  We're going to enter a not guilty plea

4     on your behalf, sir.

5          All right.  Mr. Derrick Washington, you are charged

6     in Count 21, which is a conspiracy to commit wire fraud

7     charge.  That's conspiracy to commit wire fraud in connection

8     with -- which bond was that, Mr. Day?

9          UNIDENTIFIED SPEAKER:  The Derrick Washington bond

10    is --

11         THE COURT:  Okay.  So conspiracy to commit wire

12    fraud in connection with your bail bond.  Do you understand

13    the charge and the maximum penalty that you face if convicted?

14         DEFENDANT WASHINGTON:  Yes, ma'am.

15         THE COURT:  All right.  Have you had enough time to

16    talk with your attorney about the charges in the indictment,

17    or the charge in Count 21?

18         DEFENDANT WASHINGTON:  Yes, ma'am.

19         THE COURT:  Are you ready to enter your formal plea?

20         DEFENDANT WASHINGTON:  Yes, ma'am.

21         THE COURT:  And how do you plead?

22         DEFENDANT WASHINGTON:  Not guilty.

23         THE COURT:  All right.  We're going to enter a not

24    guilty plea on your behalf.

25         Mr. Derrick, you are also charged in Count 21, which

1    is conspiracy to commit wire fraud in connection with the bail

2    bond for Mr. Washington.  Do you understand the charge, sir?

3            DEFENDANT DERRICK:  Yes, ma'am.

4            THE COURT:  All right.  Are you ready -- have you

5    had enough time to talk with your attorney to be able to enter

6    your formal plea?

7            DEFENDANT DERRICK:  Yes, ma'am.

8            THE COURT:  And how do you plead?

9            DEFENDANT DERRICK:  Not guilty.

10            THE COURT:  We're going to enter a not guilty plea

11    on your behalf.

12            MR. DAY:  Your Honor, it's actually in connection to

13    the bond for James Palladina.

14            MR. DEES:  Yes, I believe, Your Honor, he's correct

15    on that.  It will be Counts --

16            MR. DAY:  It's 39 and 44.

17            MR. DEES:   -- 39 and 44.

18            THE COURT:  Okay.

19        (Pause in the proceedings.)

20            THE COURT:  Okay.  I've just been reading the wrong

21    lines.

22            All right.  Mr. Derrick --

23            DEFENDANT DERRICK:  Yes, ma'am.

24            THE COURT:   -- you're not charged in Count 21.

25    You're charged in Counts 39 and 44.  Count 39 is a charge of

1    conspiracy to commit wire fraud in violation of 18 US Code

2    Section 1349 and 1343.  I've already told you what the maximum

3    penalty is.  That conspiracy is alleged to have occurred

4    between April 2021 and June 2021 and involved the bond of

5    James Palladina, and then Count --

6             MR. DAY:  44 I believe, Your Honor.

7             THE COURT:  -- 44 is the wire fraud charge which

8    alleges that you committed wire fraud on June 22 of 2021,

9    again, in connection with the bond for James Palladina, and it

10   carries the same maximum penalty.  Do you fully understand

11   those charges?

12            DEFENDANT DERRICK:  Yes, ma'am.

13            THE COURT:  All right.  And how do you plead to the

14   charges in Counts 39 and 44?

15            DEFENDANT DERRICK:  Not guilty.

16            THE COURT:  All right.  We're going to enter the not

17   guilty plea on your behalf.

18            All right.  Mr. Skrivanek, you are charged in Count

19   39 and 43.  Count 39 is the same conspiracy charge that I just

20   spoke with Mr. Derrick about, it's a conspiracy to commit wire

21   fraud in connection with the bond for James Palladina.  And

22   Count 43 is the wire fraud charge, that you are alleged to

23   have electronically transferred fraudulent information on June

24   22, 2021 in connection with the bond with James Palladina.

25            Do you fully understand those charges?

1          DEFENDANT SKRIVANEK:  Yes, Your Honor.

2          THE COURT:  And are you -- have you had enough time

3    to talk with your attorney about the charges?

4          DEFENDANT SKRIVANEK:  Yes, ma'am.

5          THE COURT:  And how do you plead to Counts 40 -- 39

6    and 43?

7          DEFENDANT SKRIVANEK:  Not guilty.

8          THE COURT:  All right.  We're going to check not

9    guilty plea on your behalf also.

10          The case is assigned to Judge Rosenthal, there's a

11    scheduling order in place.  I think we're now ready to start

12    with the detention hearing.

13          So let's go in the order of Defendants, so it would

14    be Mr. Wattell, Mr. Washington, Mr. Skrivanek and Mr. Derrick

15    in order of questioning.

16          MR. DEES:  Just the *Brady* admonishment for the

17    Government.

18          THE COURT:  Have they -- have they not appeared with

19    their counsel before?

20          THE CASE MANAGER:  I believe they have, Judge.

21          MR. DEES:  I guess I want to ask --

22          THE COURT:  Have we given *Brady*?

23          MR. DEGEURIN:  I believe, as far as Mr. Wattell, we

24    were here when you admonished the Government about *Brady*.

25          THE COURT:  Okay.  Everyone's shaking their head.

1    Just in case, Mr. Day, if I haven't already given the *Brady*

2    rule with all these Defendants, I'm giving it to you now.  Do

3    you need me to repeat it?

4              MR. DAY:  No, Your Honor.

5              THE COURT:  All right.  The *Brady* order is entered.

6              MR. DEES:  Thank you, Judge.

7              THE COURT:  Okay.  So again, let's go in that order,

8    Mr. Wattell, Mr. Washington, Mr. Skrivanek, Mr. Derrick.  And

9    everybody can have a seat.

10             MR. DAY:  Have Mr. Derrick last or --

11             THE COURT:  Last because --

12             MR. DAY:  Okay.

13             THE COURT:   -- he's Defendant 50.  I just

14   incorrectly had Mr. Derrick charged in Count 21.

15        (Pause in the proceedings.)

16             MR. MARTIN:  Judge, I guess you're intending to do

17   the detention hearing all together just as to the order of

18   questioning.

19             THE COURT:  Correct.

20             MR. MARTIN:  So we have them at counsel table then?

21             THE COURT:  Correct.  Yes.

22             MR. MARTIN:  Okay.

23        (Pause in the proceedings.)

24             MR. DEGEURIN:  And, Judge --

25             THE COURT:  Yes.

1          MR. DEGEURIN:   -- before we I guess --

2          THE COURT:  Do you want all counsel?

3          MR. DEGEURIN:  No, just -- I was just going to --

4    kind of setting the ground part -- or kind of setting the

5    field for the detention hearing.  My understanding is that

6    they're moving for detention on -- based on risk of flight.

7    So the issue really is just risk of -- this is not --

8          THE COURT:  Well, here's how --

9          MR. DEGEURIN:   -- a presumption case.

10          THE COURT:   -- here's how it works.  Serious risk

11   of flight is the basis for the motion, so they have to show

12   that there's a serious risk of flight.  Once they do that,

13   they can also put on evidence of danger to the community and

14   that can be considered in making the determination of bond or

15   no bond.  But they've got to establish serious risk of flight.

16          MR. DEGEURIN:  And then also part of the detention

17   hearing would be the strength of the evidence for bond issues

18   too.  Right?  We'll be able to go into the particularities of

19   what's within reason, why --

20          THE COURT:  Within reason.

21          MR. DEGEURIN:   -- why they are alleging that our --

22   right now it's conspiracy, just as a conspiracy, and it

23   doesn't say what the particularities of each Defendant did.

24          THE COURT:  Within reason, I mean that's the least

25   important factor, but I think we have 4 sets of lawyers, but

14

1    within reason you can ask about the strength of the evidence.

2              Any objection to that, Mr. Day?

3              MR. DAY:  No, Your Honor.

4              THE COURT:  Okay.  All right.  You may call your

5    first witness.

6              MR. DAY:  I call Anthony Turner.

7         (Pause in the proceedings.)

8              THE COURT:  And just for the Record, Mr. DeGeurin,

9    it's serious risk of flight or non-appearance.

10             MR. DEGEURIN:  Thank you, Judge.

11             THE COURT:  Uh-huh.

12             THE CLERK:  Please raise your right hand.

13        (Witness sworn.)

14             MR. DAY:  May I proceed, Your Honor?

15             THE COURT:  You may.

16                        DIRECT EXAMINATION

17   BY MR. DAY:

18   Q    Say your name for the Record.

19   A    My name is Anthony Turner.

20   Q    And spell your last name.

21   A    T-U-R-N-E-R.

22   Q    And how are you currently employed?

23   A    I'm a sergeant with the Houston Police Department and

24   also serve as a TFO, which is a Task Force Officer, with the

25   FBI.

1   Q    And were you involved in the investigation that was the

2   subject of this indictment?

3   A    Yes, I was.

4   Q    And can you briefly tell the Court how this investigation

5   came about?

6   A    So briefly this investigation came about, it started as

7   an investigation into the violent crimes in southeast Houston.

8   As we started investigating the violent crimes in southeast

9   Houston we uncovered what we considered to be a massive bail

10  bond fraud scheme.

11  Q    And did you get a chance to begin to investigate that

12  scheme?

13  A    Yes, we did.

14  Q    And in terms of investigation techniques did that include

15  listening to recorded jail calls?

16  A    Yes, it did.

17  Q    And did you also talk to witnesses and subjects of the

18  investigation?

19  A    Yes, we did.

20  Q    And as you began to investigate the case what patterns

21  developed in terms of what you're seeing with regard to the

22  bonds?

23  A    So the pattern that we started to see is that they were

24  using one particular bail bond company, Aable Bail Bond, and

25  they were either using 1 or 2 names, Oscar Wattell or they

1   were -- they didn't use his last name, but his name's Oscar

2   Wattell we later identified, or they were using a black female

3   by the name of Mary Brown.

4   Q    And you referred to an individual named Oscar Wattell.

5   Did you begin to investigate him and his connection to the

6   bail bond company?

7   A    Yes, we did.

8   Q    And what did you learn about his connection to the bail

9   bond company?

10   A    We first learned that he was a felon and we started to --

11   as we started to investigate we uncovered that he played a

12   role in the bail bond -- in the bonding process as far as he

13   was considered a manager of the bonding company and then he

14   was also a recruiter as far as we considered to people in

15   southwest Houston, you know, as people come to get bonds, you

16   know, people get out on bond.

17         His connection was also vaguely -- or we loosely

18   tied to some gang members that would use Aable, and then he

19   also provided check stubs or information to get them to use

20   Aable to then go through this bonding, this fraud process.

21   Q    During the course of the investigation did you see his

22   name connected to any bonds?

23   A    On paperwork or just in evidence period?

24   Q    In the evidence that you reviewed.

25   A    Yes, so we obtained maybe 180, 200 boxes of evidence from

ANTHONY TURNER - DIRECT BY MR. DAY

17

1    Aable.  And within that evidence his name was on ledgers being

2    paid for bonds.  As we -- when we wrote a search warrant into

3    the email for Aable, or, you know, several search warrants and

4    emails, there was emails with, you know, with information tied

5    to Oscar Wattell on it.  There's several pieces of evidence

6    that tie him to the fraud scheme.

7    Q    I want to talk to you about some specific bonds.  Are you

8    familiar with Curtis Holliday bail bond.

9    A    Yes.

10   Q    And was Mr. Wattell tied to this particular bail bond?

11   A    Yes, he was.

12   Q    And what was his role within this Curtis Holliday bail

13   bond?

14   A    So his role within the Curtis Holliday bond was the one

15   that we were able to prove was the one, T.R. Celestine, which

16   was a family member, I think a cousin of his, and he brought

17   over to her house blank co-signer applications for her to fill

18   out for individuals that did not give them permission for

19   their identities to be used, and this assisted Curtis Holliday

20   to get out on a fraudulent bond.

21   Q    What's the significance of a co-signer application?

22   A    So a co-signer application, they use their income to

23   then -- they have to meet a certain threshold of income to be

24   able to qualify for the bond, so they're looking at the level

25   of -- how much risk they're taking.  So the more -- the more

18

1    people that take on the risk for him, the SES, other bail

2    bonding company, they're more likely to, you know, to take on

3    the bond.

4            THE COURT:  Can you go through the -- I got a little

5    confused, you said -- we were talking about the Curtis

6    Holliday bond and you were asked about Mr. Wattell's ties to

7    it and you started talking about Defendant Celestine and

8    taking blank co-signer forms to her house for people who had

9    not given authority right.  I'm a little confused about

10   these warrants --

11           THE WITNESS:  So the co-signers that were used on

12   the bond for Curtis Holliday, their applications were filled

13   out by Celestine.  And those applications were given to

14   Celestine by Oscar Wattell, which were then filled out and

15   then used for him to obtain the bond.

16   BY MR. DAY:

17   Q    And was additional evidence gathered that confirmed the

18   Celestines connection to the Holliday bond?

19   A    Yes, we interviewed her.  During the interview I mean she

20   identified -- she identified Oscar, she identified that she

21   did fill out the bonds for several people, and there was also

22   text communication that we used as evidence, that we have as

23   evidence.

24   Q    And are you familiar with the Patrick Brown bond?

25   A    Yes.

ANTHONY TURNER - DIRECT BY MR. DAY

19

1    Q    And was Mr. Wattell connected to this bond as well?

2    A    Yes, he was.

3    Q    And what was his connection to this bond?

4    A    His connection was -- to this bond was during the

5    interview process of Patrick Brown and Michael Ford they

6    identified Oscar as dealing with them, but they didn't really

7    go into specific details.  But more importantly, when we

8    interviewed the mom, Verna Brown, she identified Oscar by

9    picture and she also identified -- she also explained that she

10   paid Oscar money to push the bond through the company.

11   Q    What was the significance of that money that she paid

12   Mr. Wattell?

13   A    The significance of the money is she believed that this

14   was going to be used for them to bypass the insurance process.

15   Q    And are you familiar with the bail bond of Wallace

16   Thomas?

17   A    And was Mr. Wattell connected to this bond as well?

18   A    Yes, he was.

19   Q    And what did you learn about his connection to the bond?

20   A    So while this -- I'm sorry.  Oscar's connection to the

21   Wallace Thomas bond was through -- it was through a couple of

22   people, but most importantly it was through Meghan Tillis and

23   Meghan Tillis, she was reached out by a person through social

24   media.

25         She didn't identify the person, she said, An unknown

1    black male.  And we believe that black male was Oscar Wattell
2    because the way he described hisself is that, I unofficially
3    work for the bonding company and that I'm a felon, and she
4    was -- she was then introduced to Aable to go through the
5    process.
6    Q    And one of the co-defendants, Meghan Tillis, did she have
7    a connection to Mr. Wattell?
8    A    I believe they went to high school together, or they went
9    to -- I believe they went to high school together.
10   Q    And are you familiar with the bond of Derrick Washington?
11   A    I am familiar with Derrick Washington.
12   Q    And was Mr. Wattell connected to this bond as well?
13   A    Yes, he was.
14   Q    And what was his connection to this bond?
15   A    So in the interview with Derrick Washington he was
16   identified to just dealing with him, Derrick dealt with Oscar
17   through receiving -- it's not an ankle monitor but it's a
18   monitor that's not given through the court but that's given
19   through the bail bonds company that they would have to pay
20   for.
21        More dealing with, it seemed like Oscar dealt
22   with -- more with Derrick Washington's Desiree common-law
23   wife, Dralanjala Johnson, and Dralanjala identified Oscar
24   Wattell as paying him for the fake check stubs and dealing
25   with Oscar through the process of -- through the bonding

ANTHONY TURNER - DIRECT BY MR. DAY

1    process.

2    Q    And was Ms. Johnson charged in the indictment as well?

3    A    She was charged in the indictment.

4    Q    I turn your attention to the James Palladina bail bond.

5    A    Yes.

6    Q    And are you familiar with that bail bond?

7    A    I am familiar with it.

8    Q    And was Defendant Calvin Skrivanek connected to that

9    bond?

10   A    Yes, he was.

11   Q    And what was his connection or role within that

12   particular bail bond scheme?

13   A    The Calvin connection is that he was a co-signer that

14   provided -- that with his co-signer application a materially

15   false statement was provided in the check stubs and was used,

16   you know, to meet the threshold of the bond for James

17   Palladina.

18   Q    And was the information that was contained in the check

19   stubs vetted or investigated by the investigative team?

20   A    Yes, they were.

21   Q    And what was determined regarding that information?

22   A    It was determined that the company that was -- that he

23   said he worked for didn't exist.

24   Q    And on the same bond, the James Palladina bond, are you

25   familiar with Defendant Rashad Derrick's connection to that

1    bond?

2    A    Yes.

3    Q    And what was his connection to that bond?

4    A    His connection is the same as Palladina -- I mean, sorry,

5    same as Calvin Skrivanek which he was a co-signer on the

6    application that provided, you know, provided a materially

7    false statement in the check stubs and, you know, a company

8    that was written on the application --

9        MR. DEES:  May I -- I apologize.  Could you repeat

10    that last -- I didn't quite catch that last thing you said

11    about Mr. Derrick, how he was connected to her.

12        THE WITNESS:  Provided -- he provided a fake check

13    stub.

14    BY MR. DAY:

15    Q    The information contained in the check stub was that

16    investigated or vetted by the investigative team?

17    A    Yes.  So the way we subpoenaed the company that on the

18    application it was stated that he worked for, that company

19    returned saying they had no -- they had no records of

20    Mr. Derrick working for them.

21    Q    And were there jail calls that were reviewed that further

22    connected Mr. Derrick to the Palladina bond?

23    A    Yes, so around the time that the -- that was dated on the

24    application, there also is a recorded phone call where you can

25    hear -- you can hear Derrick speaking to the Defendant James

1    Palladina from the Harris County Jail and he's speaking to him

2    about going to get the check stub out of his car and being

3    inside Aable Bail Bonds and completing the process.

4    Q    Did you or the investigative team make attempts to arrest

5    Mr. Derrick last week on July 24?

6    A    Yes, we did.

7    Q    And can you summarize what attempts were made and what

8    ensued?

9    A    So the attempts that were made was we had an arrest team

10   go and their first job is to just knock and announce and try

11   to get them to come out.  At some point Mr. Derrick

12   acknowledged that he was in there but refused to come out of

13   the location.  Several attempts were made to call him out.

14   Eventually he ended up becoming what we identify as a

15   barricaded suspect.

16         And at that time, once he considered a barricaded

17   suspect, we turn it over to the SWAT team which after about 2

18   to 3 hours they were able to get him out of the location

19   without, you know, any danger to anybody.  And then once he

20   got to the -- what we -- the modified detention center that we

21   had, it was discovered that he had drugs in his pocket.

22   Q    Do you know what kind of drugs they were?

23   A    They were -- I don't know, they hadn't been tested, but

24   they were unidentified pills.  They, I would believe to be

25   maybe OxyContin or -- but I'm not an expert.

ANTHONY TURNER - DIRECT BY MR. DAY

1    Q    So the pills that were located are still being tested?

2    A    They are still being tested.

3    Q    And you saw -- as far as the length of time it took from

4    the time the investigative team got there to the time they

5    were able to safely get Mr. Derrick out of the house how much

6    time --

7    A    It was approximately 2 to 3 hours.  So this was -- this

8    was a slow process to try to get him to come out of the house.

9    So calls were made through an intercom, we called his phone,

10   they got his mom involved, so there were several attempts were

11   made to try to safely get him out of the house.

12   Q    Were you or the investigative team also involved in the

13   arrest of Mr. Skrivanek?

14   A    Yes, we are.

15   Q    And can you describe the process that was done to secure

16   his arrest?

17   A    Yes, well, the issue with Calvin -- sorry, I can't

18   pronounce his last name correctly -- the issue with him is

19   that he doesn't have a stable residence.  So as we

20   investigated to try to locate him we went to several family

21   members.  Family members hadn't talked to him in several

22   months, some of them considered him to be dead.  We finally

23   located him in a homeless encampment under a freeway.

24        MR. DAY:  We pass the witness.  We do have 1

25   additional witness as well.

1        THE COURT:  All right.  Mr. DeGeurin.

2        MR. DEGEURIN:  Thank you, Judge.

3                    CROSS-EXAMINATION

4   BY MR. DEGEURIN:

5   Q    Agent Turner, in investigating Mr. Wattell I assume you

6   ran a criminal history check on him?

7   A    Yes.

8   Q    And I know that -- and we have a copy the Pretrial

9   Report.  I assume you haven't seen the Pretrial Report with

10  the printed out criminal history, but you did some type of

11  criminal history check on Mr. Wattell.

12  A    Yes.

13  Q    And in that criminal history check in like 2018 he was on

14  bond for certain offenses.

15  A    Uh-huh.

16  Q    Correct?

17  A    Yes.

18  Q    And there was a bond forfeiture on several of these

19  offenses.  Are you familiar with that?

20  A    I'm not.

21  Q    Well, were you familiar with who was his bonding agency

22  while he was on -- in custody in 2017-2018?

23  A    I don't know specifically but I know at some point if you

24  lean towards Aable --

25  Q    Right.

1    A    -- I know at some point he was an Aable client.

2    Q    And you realize that those bond forfeitures that says

3    that he was -- forfeited the bonds, he was in custody in

4    Montgomery County Jail at the time, but they said he didn't

5    appear in the Harris County Jail.  Correct?

6    A    I don't know.

7    Q    So in your investigation of Mr. Wattell leading up to his

8    arrest were you watching Mr. Wattell?

9    A    Ask me the question again?

10   Q    Did you do surveillance on Mr. Wattell prior to his

11   arrest?

12   A    I did surveillance.  You're talking about the 2 weeks

13   leading to his arrest or during the 2-year process?

14   Q    I guess --

15   A    There was surveillance done on everyone.

16   Q    Well, let's talk about the 2 years prior to the arrest,

17   so in --

18   A    Okay.

19   Q    -- you agree with me Mr. Wattell got out of custody some

20   time in 2018.  When do you believe that Mr. Wattell began

21   working with Aable?

22   A    I believe it was somewhere maybe around 2020.

23   Q    So from 2020 to 2024 and his arrest did you follow him or

24   have other agents follow him, check into where he was working?

25   A    Yes.

ANTHONY TURNER - CROSS BY MR. DEGEURIN                    27

1    Q    And at what time did Aable close down?  There was at some

2    point that you did an investigation and Aable ceased to be

3    taking bonds.  Right?

4    A    Right.  So Aable, they started to close down around the

5    execution of the search warrant, so it probably was around --

6    a little after -- maybe -- I think that would be June of '21

7    maybe, or '22.

8    Q    Right.  So, in fact, all the offenses and all the conduct

9    in this case is 2021 and prior.  Correct?

10   A    Yeah, we took a small snapshot and we investigated only a

11   small piece of Aable.

12   Q    But there is no -- there is no allegation from 2021 to

13   2024 that there was any violation of bonds or wire fraud or

14   anything like -- you're not making an allegation of anything

15   past 2021.  Right?

16   A    What we can prove and what he was charged with was the

17   information that we found during the snapshot.  So if you're

18   asking me if I believe he was engaged in the bonding processes

19   after we executed the search warrant, I would say that we

20   learned that he was, but there is no evidence to prove that.

21   Q    Okay.  So there is no evidence that there's any bond

22   issue -- what he's charged with right now in this -- under

23   this indictment, you're familiar with the indictment --

24   A    Yes.

25   Q     -- I assume you testified in front of the Grand Jury.

ANTHONY TURNER - CROSS BY MR. DEGEURIN

28

1    Right?

2    A    No, I didn't.

3    Q    Somebody in your agency was the witness. You don't have

4    to tell me, I'm not trying to get to the --

5    A    Gotcha.

6    Q    -- but somebody in your -- you're the case agent.

7    A    I am.

8    Q    You're aware of what the charges are.

9    A    Yes.

10    Q    Are you aware that none of the allegations are past 2021?

11    A    I think that they're not past 2021.

12    Q    And so from 2021 to July 2024 do you have any indication

13    that Mr. Wattell ever left the Houston area?

14    A    I don't know. We weren't doing that much surveillance.

15    So I wouldn't know if he left the Houston area -- oh, yes, to

16    go to Galveston.

17    Q    Okay. Well, the Houston area of Houston -- the Southern

18    District of Texas, Galveston --

19    A    I have no -- no idea.

20    Q    Do you know where he lived when you -- were you part of

21    the arrest team for Mr. Wattell?

22    A    I was not part of it, but I was a part of locating him

23    and then passing it over to the arresting --

24    Q    Where was he located?

25    A    He was located in an apartment complex on Tanglewilde.

ANTHONY TURNER - CROSS BY MR. DEGEURIN

29

1    Q    And are you aware that he lived there for 3 years?

2    A    I was not aware of that.  Once I located where I thought

3    he was I passed it over.  We had 40-something people to

4    locate.,

5    Q    I guess the question -- there's not a question that

6    Mr. Wattell was hiding anywhere.  Right?  He was in the same

7    apartment for 3 years, that you gave the information and 3

8    years later when you went to go arrest him, that's where he

9    was.

10   A    I don't think he was hiding from me, no.

11   Q    Right.  So he wasn't trying to run from -- there was a

12   search warrant done on Aable, that investigation was in the

13   open, right, that there is an investigation at Aable.

14   A    Yes, sir.

15   Q    And Mr. Wattell, he didn't skip town, did he?

16   A    No.

17   Q    He didn't change his address.

18   A    He probably changed his address during the investigation,

19   but I don't know.  I know where I located him at, I don't

20   where he lived during the investigation.

21   Q    The apartment complex.  And do you know who is staying in

22   that apartment complex?

23   A    I know that it's leased to a Justine, but I don't know

24   their relationship, maybe a girlfriend.

25   Q    Right.  Were you aware that she had lived there for 6

1    years and in the last 3 years Mr. Wattell lived with her

2    there?

3    A    I wasn't aware, that's --

4    Q    That's an apartment complex on --

5    A    Somewhere off Richmond in --

6    Q    Right.

7    A     -- the Westheimer area.

8    Q    Right, right.

9    A    Uh-huh.

10   Q    Tanglewilde.

11   A    Yes.

12   Q    Now do you have any indication Mr. Wattell changed his

13   phone number?

14   A    Yes, I do.

15   Q    When did that happen?

16   A    I don't know, but his phone number has changed.  The were

17   several numbers for him during the time of the investigations

18   occurring.

19   Q    Right.  But once there was a disassociation of Aable,

20   once there was a search warrant -- are you familiar where

21   Mr. Wattell is working currently?

22   A    I'm not.  We couldn't locate where he was working

23   currently.

24   Q    Where was he arrested?

25   A    He was arrested, if I'm -- leaving the apartment, or at

1      the apartment.

2      Q     Where you knew where he was in 2021 and that's where you

3      arrested him in 2024.

4      A     I didn't know he was there in 2021.  So I knew he was

5      there once we decided to arrest him.

6      Q     Let me ask you a little bit about some of the underlying

7      factors.  Is it -- I understand in medical, like Medicare

8      fraud and something like that, there are specific regulations

9      about advertisement, who can advertise and who can't

10     advertise.  In the bonding industry is there a prohibition to

11     advertising for getting clientele?

12            MR. DAY:  Your Honor, at this point I'm going to

13     object to the relevance of the question.

14            THE COURT:  Well, I think you're talking about Count

15     47?

16            MR. DAY:  That -- yes.

17            MR. DEGEURIN:  That -- yes.

18            MR. DAY:  Well, Count --

19            MR. DEGEURIN:  I'm sorry --

20            MR. DAY:   -- well, Count 47, but also they're

21     saying that -- his allegation today is that Mr. Wattell used

22     social media to advertise for Aable, and that's not a crime,

23     and --

24            THE COURT:  I don't think that --

25            MR. DAY:  His only involvement in this bond that

ANTHONY TURNER - CROSS BY MR. DEGEURIN

1      they're -- the first bond was that he was advertising and

2      trying to get clientele to come Aable, and that's not a crime

3      that I'm aware of and I'm --

4              THE COURT:  Well, I think they're the allegations of

5      false information being submitted so.

6              MR. DAY:  That was on other -- other Defendants --

7              THE COURT:  All right.  Very short leash.

8      BY MR. DEGEURIN:

9      Q    Is it a -- to your knowledge is it an offense to

10     advertise for a bonding company?

11     A    No.

12     Q    Is it a crime to be a runner to try to drum up business

13     for a bonding company to your knowledge?

14     A    Like --

15     Q    To get clientele.

16     A    No.  No, those are not things that we're alleging.

17     They're the -- the things that we're alleging is -- of his

18     practice, is that he assisted and aided people in getting

19     false documentation that would be used in the bonds.  Not only

20     did he do that, but he also received money for these bonds, so

21     being paid.  So those are the allegations, sir.

22     Q    Well, I understand your allegations.

23     A    Okay.

24     Q    That's the indictment.  Right?

25     A    Yes, sir.

1    Q    Although in the indictment you just say conspiracy.

2    There's not -- individual acts are not alleged in the

3    indictment, it's kind of a broad indictment, do you agree?

4    A    Right.  My --

5              MR. DAY:  Judge, I object to relevance.

6              THE COURT:  Yeah, that's a --

7              MR. DEGEURIN:  All right.

8              THE COURT:   -- legal conclusion.

9              MR. DEGEURIN:  Okay.

10   BY MR. DEGEURIN:

11   Q    Bonding companies do take money to set bonds.  Right?

12   A    They receive a premium, yes.

13   Q    Right.  And that -- it can be cash, it can be check, it

14   can be all different ways that it can be done.  Right?

15   A    Yes.

16   Q    So it's not unusual for somebody who's getting a bond to

17   give cash to somebody who works for the bonding company.

18   A    No, it wouldn't be unusual.

19   Q    The --

20   A    But --

21   Q     -- now -- hold on --

22   A    Gotcha.

23   Q     -- when somebody -- in this time and your training and

24   your experience you've become, I would assume, really familiar

25   with the state bonding process and the underwriting and the

ANTHONY TURNER - CROSS BY MR. DEGEURIN

1    insurance and things like that to how a bond is -- first how a

2    bond is set, how a bond is insured, and who is able to

3    underwrite or not underwrite a bond.  Do you learn all those

4    things?

5    A    I have an overview, I didn't get into the -- into the --

6    I didn't drill down any, but I know enough to kind of

7    understand the process.

8    Q    Do you understand the co-signing process, someone who's

9    going to say, We will co-sign for somebody?

10   A    Yes.

11   Q    Is it a requirement that a co-signer be a family member?

12   A    No.

13   Q    Is it a requirement that the co-signer be an employer?

14   A    Be an employer of who?

15   Q    Of the Defendant.

16   A    No.

17   Q    There is no restriction as to who can be a co-signer.

18   Correct?

19   A    From my understanding.

20   Q    And if a -- if somebody is asked to be a co-signer, as

21   long as they qualify to be a co-signer, they don't have to

22   have -- they don't have to be in a relationship, they don't

23   have to be married to, they don't have to be a sibling,

24   there's no requirement as to who's willing to sign a bond as

25   long as they're qualified to do so.

1    A    Those who are qualified they have permission -- I mean

2    they want to do it, yes.

3    Q    Right.  But you don't have to particularly even know the

4    person that you're agreeing to -- you're -- a co-signer is

5    saying, I agree that if this Defendant doesn't show up that

6    I'll be liable for the bond.  There's no requirement that that

7    person actually know the Defendant.

8    A    Correct.

9    Q    Right.  Okay.  You had a -- did you do an interview of

10   Mr. Wattell?

11   A    Not one where his -- yes, I did, when he was arrested,

12   but not prior -- not prior to that.  We spoke on the phone,

13   but he was Mirandized, so the only interview that count was

14   the one after he was arrested.

15   Q    That's consistent with what I understand.  We haven't

16   been provided statements.  He never gave a statement to you or

17   any other officer --

18   A    No, he did not.

19   Q    -- that you're aware of.  Okay.  You had mentioned that

20   there are recorded phone calls from the jail.

21   A    Yes.

22   Q    Do you have indication that Mr. Wattell was specifically

23   on those phone calls, or --

24   A    Yes.

25   Q    So how many phone calls are we talking about?  In general

1    how many jail phone calls do you have that you've reviewed?

2    A    Probably listened to close to 500 hours, maybe not just

3    with Wattell, but in general.  And not me personally but my

4    team.

5    Q    And having somebody ask for a bonding -- or trying to

6    find a bonding company and using the jail phone calls to do

7    so, that's the normal course of business.  Correct?  Someone

8    who's in jail, they call a bonding company, or they call

9    somebody associated with a bonding company to try to get bond.

10   A    Yes, unless you're talking about conspiring to commit

11   fraud to, you know, to obtain a bond.  But to answer your

12   question, yes.

13   Q    Do you have any information that Mr. Wattell has any

14   contacts outside of the Southern District of Texas?

15   A    No, I don't have any information, I don't know.

16              MR. DEGEURIN:  I'll pass the witness.

17              THE COURT:  Thank you.  Next.

18              MR. MARTIN:  Judge, may I use the podium?

19              THE COURT:  You may.

20              MR. MARTIN:  Thank you.

21                        CROSS-EXAMINATION

22   BY MR. MARTIN:

23   Q    Good morning, sir.

24   A    Good morning.

25   Q    I'm Tom Martin, I represent Derrick Washington.

1  A    Yes, sir.

2  Q    My questions are going to be relating specifically to

3  him.

4  A    Yes, sir.

5  Q    The indictment says that an allegation of sending false

6  documents relating to a bond happened back in December of '21

7  to January of '22.  Am I correct?

8  A    I'm not familiar with those dates, but around that time.

9  Q    Okay.

10  A    And this is because my co-case agent could probably

11  answer these questions, but I'll answer them to the best of my

12  ability, but due to the amount of people we had in this

13  investigation, he knows some of the targets better than I do.

14  Q    I'll make a representation to you, Mr. Turner, that

15  Paragraph 21 of the indictment says, Beginning on or about

16  December 2021 and continuing through and on or about January

17  2022 --

18  A    Okay.

19  Q     -- and then it goes on from there.

20  A    Yes, sir.  So to answer your question, yes.

21  Q    Okay.  Thank you.  You took a look at Mr. Washington's

22  criminal history.  Correct?

23  A    Yes, I did.

24  Q    Okay.  You're aware that his criminal history covers many

25  years.  Is that a fair statement?

1     A    Yes.

2     Q   And notably in his criminal history it all relates to

3     activities here in the Houston area.  Would you agree?

4     A   I mean I don't know.  I don't know where he was arrested

5     at when I'm looking at his criminal history.

6     Q   Okay.  Let me refresh your memory --

7            THE COURT:  Mr. Moran (sic), just for the Record I'm

8     taking judicial notice of all 4 Pretrial Services reports, so

9     I will take judicial notice of all the information contained

10    in the reports.

11           MR. MARTIN:  Thank you, Judge.

12           THE COURT:  Uh-huh.

13    BY MR. MARTIN:

14     Q   Do you -- moving forward then, do you know when

15    Mr. Washington signed the bond application form?

16     A   I don't, but it would have had to have been after he was

17    let out of jail.

18     Q   Okay.  And when you say let out of jail, that was let out

19    of jail on the charge for which he's currently on parole.

20    Would you agree?

21     A   I'm not sure what charge he went to jail for because some

22    of the cases could have been dismissed, but when he was in

23    Harris County Jail he was let out on the fraudulent bond and

24    then he would have went to a bonding company to sign the

25    actual paperwork.

1    Q    Well, I'll represent to you he was on parole for a

2    possession charge.

3    A    Still I don't know if that was the charge --

4    Q    And --

5    A    -- he went --

6    Q    -- now moving forward, do you have any specific

7    information that shows as to whether Mr. Washington filled out

8    the form or whether he just signed the form?

9    A    That would be a question that what my co-case agent, he

10    could answer better, but to my knowledge, I mean I'm not a

11    handwriting expert, but the application was signed by the --

12    it seemed like by the person that filled it out.

13    Q    I'm not disputing it was signed by him, but my question

14    specifically is whether the information on the form was filled

15    out by him in addition to the signature.

16    A    My understanding is that if you put you signature on the

17    4 corner of a paper, you are responsible for what's in that

18    paperwork.

19    Q    Do you have any specific knowledge as to whether

20    Mr. Washington paid anybody any money?

21    A    No, Mr. Washington, his role was very limited and I don't

22    believe that he paid anybody.

23    Q    Do you have any specific information that would say that

24    Mr. Washington received a kickback from providing this bond --

25    A    No, the kick --

1    Q    -- the bond application?

2    A    -- the kickback will be you get out of jail

3    fraudulently.

4    Q    Did he receive any money?

5    A    No, he got out of jail, sir.

6    Q    But he received no money, would that be correct?

7    A    No, he didn't receive any money to my knowledge.

8    Q    Do you have specific information that says that

9    Mr. Washington specifically transferred the documents by wire

10   to the company in Georgia?

11   A    Are you asking me that Derrick Washington, he transferred

12   the documents?

13   Q    Sure.  I'll rephrase it.

14   A    Okay.  Sorry.

15   Q    I asked a vague question, that's on me.

16   A    No problem.

17   Q    I apologize.  Do you have any specific information that

18   says that Derrick Washington personally transmitted by wire

19   the -- what you all say is a fraudulent bond application form?

20   A    Agent Hassan, he could answer that question better, but

21   my answer would be, no, he personally did not submit it.  But

22   the information he provided to the bail bonds company was then

23   submitted electronically.

24   Q    Now if he didn't do it personally, then the supposition

25   is that somebody else did it?

1    A    Yes.

2    Q    Okay.  Now you were asked previously by Mr. DeGeurin

3    regarding his client on the concept of jail calls.

4    A    Uh-huh.

5    Q    You've had access to Mr. Washington's jail calls?

6    A    We have, yes.

7    Q    Okay.  And in the jail calls would you agree that there

8    is no conversation about a conspiracy or no conversation about

9    false statements or submitting false bond applications while

10   there is conversation about getting a bond?

11   A    Are you asking me -- are you saying that Derrick

12   Washington, he did not talk about any of the bond -- any of

13   the -- ask --

14   Q    Yes.

15   A    -- ask the question differently.

16   Q    I apologize if --

17   A    No, no, no problem.

18   Q    -- I'm being vague.

19   A    I'm just trying to make sure I say it truthfully so I

20   just want to make sure I understand you.

21   Q    You've listened to jail calls from Mr. Washington.

22   A    We have listened to the jail calls.

23   Q    My question is, during these jail calls that you've

24   listened to is Mr. Washington talking about getting a bond and

25   bond procedures, things like that, or is Mr. Washington,

1    according to you all, making specific statements about, Hey,

2    we need to get documents together and knowingly that they're

3    false documents and moving along in that sort of way?

4    A    So this will be a question that my co-case agent, he

5    would answer better because he dealt with Derrick's bond.  But

6    if you're asking me during the calls that I specifically

7    listened to or that I learned from my co-case agent listening

8    to, I mean they alluded to what was going on.

9         And you had to -- what you have to do is they know

10   that these calls are being recorded, so they're not going to -

11   - most people don't just come out and say anything directly.

12   So once you piece together the calls, you can -- you can then

13   imply that they are talking about this process.  But Agent

14   Hassan will be able to explain more in detail the things that

15   he found.

16   Q    He might be the better person to ask than you.

17   A    He is.

18   Q    Okay.  Any relation to guns or weapons in this alleged

19   offense --

20   A    The conspiracy?

21   Q     -- or Derrick Washington --

22   A    What he's charged with here.  No, it's just conspiracy to

23   commit wire fraud and wire fraud.

24   Q    So no guns, nothing like that.

25   A    No, sir.

ANTHONY TURNER - CROSS BY MR. MARTIN

1    Q    Okay.  Now you've taken a look at Mr. Washington I'm

2    sure, and does he have contacts outside the state of Texas?

3    A    I have no idea.

4    Q    Okay.  Does he have a passport?

5    A    I don't know if he has a passport.

6    Q    Okay.  I'll represent to you he does not have a passport.

7    A    Okay.

8    Q    Are you aware of any trips he's made outside the Southern

9    District?

10    A    I'm not aware of any.

11    Q    I may have heard you incorrectly on your direct

12    testimony, and if I did, I apologize.  You were talking about

13    a barricaded suspect?

14    A    Yes.

15    Q    Okay.  And was that in relation to Mr. Washington?

16    A    No, that was Derrick -- Rashad Derrick.

17    Q    Okay.

18              MR. MARTIN:  Pass.

19              THE COURT:  All right.  Thank you.

20              Next counsel, counsel for Mr. Skrivanek?

21              MR. DEES:  I believe I'm last, I believe --

22              MS. PASTORINI:  Judge, I'm here --

23              THE COURT:  Counsel -- yes --

24              MS. PASTORINI:  -- I'm here for Mr. Skrivanek.

25              THE COURT:  -- Ms. Pastorini.

1          MR. DEES:  Oh, okay.  Am I next, Your Honor?

2          THE COURT:  I'm sorry, what did Ms. Pastorini say?

3          MR. DEES:  I thought Mr. Derrick was last.  I

4    thought --

5          THE COURT:  Right.  Mr. Skrivanek is next.

6          MS. PASTORINI:  Right.

7          THE COURT:  Are you -- do you have questions for the

8    witness?

9          MS. PASTORINI:  I don't, Judge.

10         THE COURT:  Okay.  Thank you.

11         All right.  Now it's your turn --

12         MR. DEES:  May I proceed --

13         THE COURT:   -- Mr. Dees.

14         MR. DEES:   -- Your Honor?

15         THE COURT:  Yes.

16                        CROSS-EXAMINATION

17   BY MR. DEES:

18   Q    Let's start with just a little bit about -- you

19   understand that in this particular indictment there are some

20   53 individuals that have been charged.  Is that correct?

21   A    I do, yes.

22   Q    Okay.  And the -- Mr. Derrick is only charged in 2 of

23   those counts.

24   A    Yes, he is.

25   Q    He's charged in Count 44 with an individual allegation of

1    wire fraud, it says he falsified a pay stub transmitted

2    electronically to Bond Pro, Inc. located in Dahlonega,

3    Georgia.  Is that correct?

4    A    He's only charged in the Palladina bond.

5    Q    Okay.  And that's on 6 -- that's on June 22 of 2021.  Do

6    you agree with that?

7    A    And that's what you're reading off the indictment?

8    Q    Yes, sir.

9    A    Yes, sir.

10   Q    Okay.  And the actual conspiracy which he's -- the

11   other -- the only other count which is conspiracy was -- the

12   conspiracy period was from April 21, 2021 to 6/22 of 2021, so

13   that's right at 2 months.  Correct?

14   A    Correct.

15   Q    And there's been no allegation in that -- as far as you

16   know, in this indictment or any other indictment of any other

17   activities by him which is the basis of the federal

18   prosecution.  Correct?

19   A    No, he was only involved in the Palladina bond.  We --

20   Q    Can you agree with that -- those time periods, sir, about

21   3 -- well, over 3 years ago.  Correct?

22   A    Correct.  Well, yes, correct.

23   Q    All right.  Let me go back to the -- let's go back to

24   this allegation about the -- about involvement in this thing.

25   You said the allegation specifically is he falsified a pay

ANTHONY TURNER - CROSS BY MR. DEES

1    stub transmitted electronically to Bond Pro, Incorporated in

2    Georgia.

3    A    Yes.

4    Q    Now are you saying he signed a -- as a co-signer on a

5    bond application?

6    A    I'm saying he was a co-signer on the application and --

7    Q    Okay.  And what applicant -- and who was -- who was the

8    person that was the -- incarcerated individual at that time?

9    A    James Palladina.

10   Q    Okay.  My client was never in jail in regard to this

11   case.  Correct?

12   A    (No audible response.)

13   Q    He was never -- he was never one of the persons who a

14   bond was trying to be made for.  Correct?

15   A    No, he was the co-signer.

16   Q    Okay.  Now do you know who presented -- do you know who

17   presented this application to him to sign?

18   A    I mean he would -- my thing is it would be different

19   people at the desk but he would go into the front office of

20   Aable, the way I know that it worked, and he would fill the

21   application out there, or somebody would bring the application

22   to him and he can take it back.  But specifically pertaining

23   to Rashad, I believe that he went into Aable and filled the

24   application out.

25   Q    You said you believe he did.

1    A    Yes.

2    Q    I assume you've reviewed police reports and investigative

3    reports about this case.

4    A    Well, the --

5    Q    And you're not --

6    A     -- I have, I wrote them, yes, sir.

7    Q    Okay.  So did he -- are you saying that Mr. Derrick went

8    to Aable Bail Bonds to sign this application?

9    A    I'm saying that I believe that he did.

10    Q    Okay.  And who would have presented it to him at that

11    time?

12    A    An Aable employee.

13    Q    Okay.  And was his -- was he given -- was he asked for

14    any particular information and present him to sign that

15    document?

16    A    On the application there's several sections, one section

17    being your personal section, where you live, you're employment

18    section, your family members, so is that what you're asking

19    me?

20    A    Well, I'm asking did -- was he required to fill that out,

21    or did someone there at Aable other than himself fill that

22    information out?

23    A    I believe that he would have filled it out.

24    Q    Was it given to him and then he was asked to sit down and

25    fill it out, or was he just asked to sign it then it was taken

ANTHONY TURNER - CROSS BY MR. DEES

1    back and someone else filled it out for him?  Do you know, do

2    you know of your own personal knowledge?

3    A    No, I don't know.

4    Q    Okay.

5    A    I can know what I believe based on my investigation, but

6    I don't know.

7    Q    Well, wouldn't it be extremely important if the

8    information that you're claiming to be false was actually

9    entered by someone other than my client?

10   A    Say that again?

11   Q    Wouldn't it be extremely important if the information

12   that was claimed to be false was not put there by my client,

13   wouldn't that be extremely important?

14   A    It would be important.  We have a phone call where he's

15   talking about it as he's going into the bonding process.  He

16   says, Hey, I'm going into the bonding company now, I just need

17   to go out to car and get the check stubs.  You done a good

18   job.  I mean I don't know what more evidence.  So we -- do I -

19   - did I see him sign it?  The application is consistent, it's

20   consistent with what we believe to be his handwriting, he's

21   saying he filled it out.  I don't know what --

22   Q    So you don't know for --

23   A    -- more you're asking me.

24   Q    -- you don't for sure who actually filled the

25   document -- filled the application out, correct?

49

1    A    I'm saying I know who I believe filled it out.

2    Q    Okay.  But you're not for sure.

3    A    Correct, I'm not an expert in handwriting.

4    Q    Okay.  And as far as the actual transmission of this

5    falsified -- allegedly falsified pay stub do you know who --

6    do you know who actually sent in the application supposedly

7    signed by Rashad Derrick to this Bond Pro, Inc. in Georgia?

8    A    I know that what happened it -- once the co-signer or

9    whomever gives the application to Aable, they have a system to

10   where it goes through the process and eventually the documents

11   are uploaded into Bond Pro.

12   Q    Okay.  But he was not -- but my client was not involved

13   in actually transmitting by wire to that location in Georgia.

14   Correct?

15   A    No, he provided the information that was then transmitted

16   electronically by an Aable employee.

17   Q    And you don't know what that information was, do you?

18   A    Information that was --

19   Q    The information --

20   A    -- false?

21   Q    -- that supposedly was false, you don't know what that

22   is.

23   A    Yes, the fake check stubs and the information that was

24   provided on the application.  The fake check stubs were fake,

25   they provided -- they were transmitted electronically and

1    they -- into Bond Pro which is housed outside of Texas.

2    Q   Okay.  Now as far as this -- as far as this situation

3    involving his arrest, you contacted him before that date,

4    didn't you?

5    A   I did.

6    Q   But you did not tell him he was under arrest then.

7    A   He wasn't under arrest.

8    Q   You did not tell him there's a warrant for his arrest,

9    did you?

10    A   There was not a warrant for his arrest.

11    Q   All right.  You just said you're a police officer.

12    Correct?

13    A   I am a police officer.

14    Q   Did you tell him you were a police officer?

15    A   I don't have to tell him I'm a police officer.  I tried -

16    - I explained to -- I don't have to tell anybody I'm a police

17    officer, but when I called him --

18    Q   Sir --

19    A   -- I explained -- I gave -- I told him my name and at

20    that point the conversation became kind of hostile, so we

21    ended the conversation.  I'm not in the business of arguing

22    with people so --

23    Q   No, sir, I'm asking the question, you were calling him

24    asking for specific information, weren't you?

25    A   I was calling him to set up an interview.

1    Q    Okay.  But did you -- but you did not tell him who you

2    were.

3    A    We didn't get to -- I did, I did identify myself.

4    Q    As a police officer?

5    A    I identified myself by my name and I said I was trying to

6    set up an interview.  So did I say I'm specifically a police

7    officer, but the way I -- the way I introduce myself, Hello,

8    my name is Sgt. Turner from the Houston Police Department, and

9    I'm doing an investigation that I would like to talk to you

10   about.

11   Q    So now you're -- now -- just a few minutes ago, sir, you

12   said you didn't tell him you were a police officer and you're

13   saying now --

14   A    I still --

15   Q    -- you were a police officer?

16   A    -- I still didn't say I'm a police officer.  I said I

17   worked for the Houston Police Department.  That don't mean I'm

18   a police -- but I say I'm a sergeant.

19            THE COURT:  Mr. Dees, let's wrap this up.

20            MR. DEES:  Okay.

21   BY MR. DEES:

22   Q    All right.  Let's get on to something else.  Okay.  Do

23   you know -- do you know for a fact -- do you that, in fact,

24   back in 2004 my client's brother was killed by a police

25   officer?

1          MR. DAY:  Your Honor, I'm going to object to
2    relevance.
3          THE COURT:  This is not relevant, Mr. Dees.
4          MR. DEES:  Well, Your Honor, I think it might go to
5    show some of his reluctance when people just come to his home
6    without properly identifying themselves.
7          THE WITNESS:  I didn't come to his home.
8          MR. DEES:  Who came --
9          THE COURT:  Hold on.  Stop.  We need -- we've got 4
10   sets of lawyers here who need to question their -- the
11   witnesses.  We have another witness after this one.  Do you
12   have any basis to believe that this man, this witness was
13   involved in 2004 with his brother's death?
14   BY MR. DEES:
15   Q    You weren't involved with your brother's death, were you?
16   Your brother was killed by a police officer, that's all I
17   asked.
18   A    Mine?
19   Q    No, no, I'm saying my client's brother was killed by a
20   police officer, do you understand that?
21   A    I do.
22   Q    Okay.
23   A    I didn't know that, but I understand.
24   Q    Okay.
25          THE COURT:  All right.

1    BY MR. DEES:

2    Q    And when he came to your home you say that he barricaded

3    himself in the house.  Did you identify yourself as a -- did

4    you go to that -- did you -- were you involved in that SWAT

5    action?

6    A    I was not involved.

7    Q    So you --

8    A    Are we talking about the phone call or are we talking

9    about --

10   Q    We're talking now about --

11   A     -- the involvement in the arrest?

12   Q     -- when they went to the home to make the arrest.

13   A    Okay.  I was not at the -- at the home to make the

14   arrest.

15   Q    Okay.  So you do not know what information was provided

16   to this -- to my client when they came to his home, do you?

17   A    I know the tactics that we use, but I don't know the

18   exact thing that was said.  I know they identified theirselves

19   several times, we use lights and sirens, we call his phone.  I

20   know the process that we go through to identify like, Hey,

21   where hostage negotiators had to get involved.  So the process

22   was very lengthy to make sure that we're trying to get you out

23   as safe as possible.

24   Q    And this was a home owned by his mother.  Correct?

25   A    I believe so, yes.

1    Q    Okay.  And he finally came out.  Correct?

2    A    After 2 to 3 hours.  Correct.

3    Q    All right.  Was he armed?

4    A    No.

5    Q    Pardon?

6    A    No, I don't believe so, no.

7    Q    Okay.  Did he attack any of the officers?

8    A    No.

9    Q    You say he had drugs in his possession, but you do not

10   know what those drugs are, do you?

11   A    I'm not an expert, they haven't been tested, so I can't

12   say what they were, I just --

13   Q    So it could be a prescription medication for all you

14   know.  Is that correct?

15   A    I know they're not that, I've been a police officer -- I

16   don't know exactly what they are.  Yes, they could be

17   prescription.

18   Q    Okay.  And his -- you know he was born in Houston.

19   Correct?

20   A    I don't know --

21            THE COURT:  Again --

22            THE WITNESS:   -- where he was born.

23            THE COURT:   -- I've taken judicial --

24            MR. DEES:  I have no questions.

25            THE COURT:   -- notice of the Pretrial Services

1    reports.

2         All right.  Any -- are you finished, Mr. Dees?

3         MR. DEES:  Yes, yes, I am.

4         MS. PASTORINI:  Your Honor, after a brief

5    conversation with my client can I ask the witness some

6    questions as well?

7         THE COURT:  Quickly.

8         MS. PASTORINI:  It's very germane to what the

9    allegations are.

10        THE COURT:  All right.  You passed the witness once,

11   but I will give you the opportunity --

12        MS. PASTORINI:  After --

13        THE COURT:   -- to ask a few questions.

14        MS. PASTORINI:  Yes, thank you, Judge.  I'll be

15   quick.

16                      CROSS-EXAMINATION

17   BY MS. PASTORINI:

18   Q    Okay.  Talk to me about when you arrested my client.  Did

19   you arrest him?

20   A    I was not part of the arrest team.

21   Q    All right.

22   A    The US Marshals was a --

23   Q    What exactly is it that he did and how many times did he

24   do it that has caused him to be under indictment in this case?

25        MR. DAY:  Your Honor, I'm going to object to the

1     form --

2              THE COURT:  Yeah --

3              MR. DAY:   -- of the question.

4              THE COURT:   -- Ms. Pastorini --

5              MS. PASTORINI:  Judge, I can --

6              THE COURT:   -- ask about the specific charges in

7     the indictment.  He is charged in Counts 39 and 43.

8              MS. PASTORINI:  Yes, ma'am.

9              THE COURT:  There's alleged to be a conspiracy to

10    commit wire fraud that was taking place from April 2021 to

11    June 2021, involved the bond of James Palladina, and the wire

12    fraud charge is alleged to have taken place on June 22, 2021.

13             MS. PASTORINI:  And, Judge, I've just got -- I'm

14    getting right to it.  If you don't mind, I'll be --

15    BY MR. DEES:

16    Q    I just want to know, do you know whether -- where it was

17    that this conversation took place with my client providing

18    this information alleged in the indictment?

19    A    What conversation are you --

20    Q    I'm talking about do you know -- do you know he has a

21    history of drug abuse and alcoholism, are you aware of that?

22    A    I'm aware that most of the people in the Palladina bond

23    had a history of something.

24    Q    Where was this slip provided to the bonding company and

25    went to the -- yeah, to the bonding company, was it in the

1    jail or was it in -- in their office?

2    A    I'm sorry, you have to -- can you ask me a direct

3    question?

4    Q    Yes, sir.  When he provided this information that's

5    alleged in the indictment was he in jail at the time or was

6    he --

7    A    No, he wasn't in jail.

8    Q    He was on bond?

9    A    Who was on bond?  Your client or --

10   Q    Yes.

11   A    Your client was a co-signer, he wasn't --

12   Q    Right.

13   A     -- he's not the Defendant.

14   Q    I know.

15   A    So he's -- we're alleging that the evidence is proving

16   that he provided a materially false statement to a bond that

17   allowed somebody to get out.  He wouldn't -- no, he wasn't in

18   jail.

19   Q    He wasn't in jail.  It was at the -- supposedly at the

20   bonding company, is that where it supposedly took place?

21   A    He went to the bonding company.

22   Q    And that's where the -- providing this information took

23   place.  Is that your position?

24   A    Yes.

25   Q    Okay.  And one other question.  Did Mr. Skrivanek, did

1    he -- is he supposedly -- I know the Judge just went over the

2    time frame for the conspiracy, how many times, if you know, is

3    he alleged to have provided that kind of information?

4    A    Just one time.  His --

5    Q    Just one time.

6    A     -- his role is limited to just him co-signing on the

7    James Palladina bond.

8    Q    And that's it.

9    A    Yes, ma'am.

10           MS. PASTORINI:  Pass the witness.

11           THE COURT:  Thank you.

12           Do you have any Redirect, Mr. Day?

13           MR. DAY:  No Redirect, Your Honor.

14           THE COURT:  All right.  You may step down. Thank

15    you.

16           THE WITNESS:  Thank you.

17        (Witness steps down.)

18           MR. DAY:  We have one additional witness.

19           THE COURT:  Yes.

20           MR. DAY:  I'll call Special Agent Adam Hassan.

21        (Pause in the proceedings.)

22           THE CLERK:  Please raise your right hand.

23        (Witness sworn.)

24           THE CLERK:  Thank you.

25           MR. DAY:  May I proceed, Your Honor?

ADAM HASSAN - DIRECT BY MR. DAY

1              THE COURT:  You may.

2                         DIRECT EXAMINATION

3    BY MR. DAY:

4    Q    Say your name for the Record.

5    A    Special Agent Hassan.

6    Q    And spell your last name.

7    A    H-A-S-S-A-N.

8    Q    And how are you currently employed?

9    A    I'm a special agent with the FBI.

10   Q    And were you involved in the investigation that's the

11   subject of this indictment?

12   A    I was.

13   Q    And were you specifically involved in the investigation

14   of the Derrick Washington bond?

15   A    Yes.

16   Q    And roughly in terms of information you looked at in the

17   investigation did you look at jail calls?

18   A    I did.

19   Q    And did you talk to potential subjects, potential

20   witnesses?

21   A    Yes.

22   Q    And the bond for which Mr. Washington was -- I guess

23   eventually posted, what amount was that roughly?

24   A    It's around $950,000.

25   Q    And do you remember what the charges that were the

1    subject of that bond, or bonds?

2    A    It was aggravated assault, and I believe there was a

3    possession of a controlled substance.

4    Q    And did you review jail calls in connection to that bond?

5    A    I did.

6    Q    And who did some of those jail calls involve?

7    A    Derrick Washington, Dralanjala Johnson and a couple of

8    other individuals as -- named as Kebel (phonetic) and Kebel's

9    mom.

10   Q    And based on the jail calls what was Mr. Washington's

11   role within this bond, referencing the jail calls that

12   happened before his release?

13   A    So Mr. Washington had regular conversations with

14   Dralanjala where they would communicate about trying to get

15   him bonded out of jail and talking about going through

16   different bonding companies.

17   Q    And did they discuss check stubs on the call?

18   A    They did.

19   Q    And did they discuss income levels?

20   A    Yes.

21   Q    What specifically did they talk about in terms of income

22   levels?

23   A    So Dralanjala learned through going through the bonding

24   process that the amount of -- the amount that the co-signers

25   needed to make had to equal the bond, so his bond being

ADAM HASSAN - DIRECT BY MR. DAY

1    950,000, the amount that the co-signers had to add up 950,000.

2    Q    And what was the discussion regarding check stubs?

3    A    So initially when the conversation first started Derrick

4    Washington had just got arrested, he was out prior, he had got

5    arrested.  They were talking to a bail bonding company

6    originally that was not Aable, it was a different bonding

7    company, it could have been by the name of Exit Bond.

8         And they were discussing -- Dralanjala had mentioned

9    she didn't have check stubs, she just owned -- she just got

10   up -- her business just got off the ground, she owns a food

11   truck company.  And they discussed with another female,

12   unidentified female about not having check stubs and that

13   female said it would be okay because of the business that she

14   owns for that specific bail bonding company, which was not

15   Aable at the time.

16   Q    And did you in the investigative team eventually

17   investigate the check stubs that were used for this bond?

18   A    Yes.

19   Q    And what did you learn from your investigation?

20   A    So what we learned from the investigation, multiple check

21   stubs that were used, a part of Derrick Washington's bond came

22   back as fraudulent as far as the amount put on there and the

23   company that the individual said they worked for.

24   Q    Did you at some point talk to Mr. Washington?

25   A    I did.

ADAM HASSAN - DIRECT BY MR. DAY

1    Q    And did you talk to his wife, Dralanjala Johnson?

2    A    I did.

3    Q    And she was also charged in the indictment?

4    A    Yes.

5    Q    And what information did you learn from Ms. Johnson?

6    A    So when I spoke to Ms. Johnson she kind of gave me a

7    little bit of the layout of how the entire bonding process

8    worked for her and Derrick, how he originally started with a

9    different bonding company because he had just got arrested

10   when he was already out on -- it may have been a bond at that

11   point, and they had to go through a court hearing and at that

12   point the judge raised the bond and they were no longer able

13   to use the original bonding company.  And at that point she

14   got a -- she went to a different bonding company which we

15   later found out to be Aable Bonds.

16   Q    And did she talk about her role within this scheme

17   involving the fraudulent check stubs?

18   A    She did.

19   Q    And what did she say?

20   A    So she mentioned receiving the check stubs from an

21   employee at Aable by the name of Oscar, she said she received

22   the check stubs from him.  At that point she used the check

23   stubs to help Derrick Washington get out of jail.

24   Q    Did you review a jail call between Ms. Washington -- I'm

25   sorry, Ms. Johnson and Mr. Washington that occurred after you

1    guys talked with Ms. Johnson?

2    A    I did.

3    Q    And what was on that jail call?

4    A    So on that jail call this was about possibly several days

5    to possibly up to a week after we interviewed Dralanjala

6    Johnson for the second time.  She then made a call to Derrick

7    Washington where he was housed at a TDC facility and they

8    started mentioning about -- they started talking about the

9    interview that we had with Dralanjala and about the FBI

10    knowing that the check stubs were fake.

11              MR. DAY:  I pass the witness.

12              MR. DEGEURIN:  Thank you, Judge.

13              THE COURT:  Do you have any questions?

14              MR. DEGEURIN:  Yes, I do.

15                    CROSS-EXAMINATION

16    BY MR. DEGEURIN:

17    Q    You're an agent -- special agent of which department?

18    A    The FBI.

19    Q    The FBI.  Are you the case agent for this case, or was

20    Sgt. Turner, or are you all co-case agents?

21    A    Co-case agents.

22    Q    So you're familiar with the investigation as well as

23    Mr. Turner -- or Sgt. Turner.

24    A    Yes.

25    Q    Did you do any independent investigation of Mr. Wattell

1      yourself?

2      A     Can you elaborate on that question?

3      Q     Did you review his criminal history?

4      A     I've seen it, I wouldn't say I reviewed it.

5      Q     Have you gone through -- well, did you know that that

6      Aable was his bonding company when he was incarcerated?

7      A     I did learn that through investigation, yes.

8      Q     Did you go through those paperwork to see how those

9      were -- for instance do you know what -- do you know what a

10     surrender -- an affidavit of surety to surrender is?

11     A     I do not.

12     Q     Do you know that if a bonding company wants to say, you

13     know, We're no longer comfortable being on bond -- or keeping

14     track of this person, they can surrender the bond?  Are you

15     familiar with that?

16     A     I've learned that from you now.

17     Q     Let me -- I guess let me ask you this, of the individuals

18     that are -- that you've -- that the Government has charged,

19     the different -- Mr. -- let's see, Curtis Holliday, Derrick

20     Washington, Patrick Brown, Desmond Tolliver, all the different

21     people who are the actual people who were being bonded did all

22     of them make it to court, did their cases resolve?

23            MR. DAY:  Your Honor, at this point I'm going to

24     object to the relevance.

25            THE COURT:  I don't even understand the question.

1    But what --

2    BY MR. DEGEURIN:

3    Q    Was there any bond forfeitures of the named Defendants

4    who got bond from -- under this indictment, did any of them

5    bond forfeit?

6    A    I'm unaware of that.

7    Q    Did the insurance companies that were -- did the wire

8    fraud insurance company is any of those insurance out of money

9    because there was a bond forfeiture?

10            MR. DAY:  Objection, relevance.

11            THE COURT:  What is the relevance, Mr. DeGeurin?

12            MR. DEGEURIN:  Well, if we're talking about a --

13            THE COURT:  To a detention hearing.

14            MR. DEGEURIN:  Yeah, well, because if we're going to

15    straight to the evidence, they were also talking about

16    potential length of punishment, because if you're thinking

17    this person may flee.  The fact that there's no insurance

18    company that's out any money is a factor.

19            THE COURT:  I've got the maximum statutory range is

20    what I'm considering.

21            MR. DEGEURIN:  That's my question is

22            THE COURT:  So let's move on.

23            MR. DEGEURIN:   -- was there any harm to any

24    insurance --

25            THE COURT:  There's no allegation that there was

1    harm to any insurance company in the indictment.  So I'm not

2    considering that.

3            MR. DEGEURIN:  Okay.

4    BY MR. DEGEURIN:

5    Q    So are you familiar with where Mr. Wattell was arrested

6    in this case?

7    A    It was mentioned earlier.  Yea, I believe it was at maybe

8    his girlfriend's house.

9    Q    And there was -- there's no indication that there was any

10   problem arresting him or anything like that.  He didn't

11   resist?

12   A    I wasn't on the arrest so I can't speak on that.

13   Q    Well, you're the case agent.

14   A    Correct.

15   Q    If there was -- if there was a problem, you would have

16   known.

17   A    If there was a major problem, yes.

18   Q    Have you checked to see whether he has a passport or not?

19   A    I have not.

20   Q    Are you aware that he does not have a passport?

21   A    I'm learning this now.

22   Q    And I asked this -- you were -- were you in the courtroom

23   when Mr. Turner testified?

24   A    I was.

25   Q    Do you agree that from 2021 to 2024 under this indictment

1    there is no -- there's no allegations after 2021 that's

2    alleged in this indictment of further crimes being committed.

3    A    I believe the -- Wallace Thomas took place in 2022 and he

4    was involved with that one, so would include 2022.

5    Q    Okay.  So after 2022 there's no indication?

6    A    After 2022 Aable shut down.

7    Q    Right.  And so once Aable shut down and there was a known

8    investigation, right --

9    A    Correct.

10   Q    -- the agent -- the agency knew, the bonding agency, the

11   insurance agencies, the employees of Aable all knew that there

12   was an investigation by at least HPD if not FBI.

13   A    Yes.

14   Q    And when you went looking for Mr. Wattell he was exactly

15   where you were going to find him.  Right?  At his apartment.

16   A    We never went looking for him besides the arrest date.

17   Q    On the arrest date you went looking for him, he was

18   exactly where you expected him to be, at his residence for 3

19   years.  Right?

20   A    He was at this arrest location the day of arrest.

21   Q    Which is the apartment that he lived.

22   A    I believe he lived there with his girlfriend, yes.

23   Q    Right.

24        MR. DEGEURIN:  I'll pass the witness.

25        THE COURT:  Thank you.

ADAM HASSAN - CROSS BY MR. MARTIN

1      Mr. Martin.

2                          CROSS-EXAMINATION

3    BY MR. MARTIN:

4    Q    Good morning, Special Agent.

5    A    Good morning.

6    Q    How are you today?

7    A    I'm going to answer some of your questions.

8    Q    I'm Tom Martin, I represent Mr. Washington.

9    A    Okay.

10   Q    Is your involvement in the case specifically relating to

11   listening to the jail calls?  Relating to Mr. Washington.

12   A    I would say I have more knowledge on Mr. Washington's

13   part in the entire conspiracy, yes.

14   Q    Okay.  Based off of your training and experience,

15   specifically on your experience, having listened I'm sure to

16   numerous jail calls from many people, it's not at all unusual

17   for somebody in custody to be talking about bonding procedures

18   and methods and, Hey, you know, Honey, get me out of jail,

19   that sort of stuff, is that pretty normal?

20   A    I've heard that on several different jail calls.

21   Q    And you mentioned in your direct testimony that there was

22   conversation regarding check stubs and that there was

23   difficulty in providing check stubs.  And I'm sure you're

24   aware that Ms. Johnson, Dralanjala Johnson, my client's common

25   law wife, she's the owner of that food truck, Food Snatcher?

ADAM HASSAN - CROSS BY MR. MARTIN

1    A    Yes, I believe so.

2    Q    And my client works at that company?

3    A    Yes.

4    Q    Okay.  And that apparently that appears to be a cash

5    business, not a pay check stub type of business.  Would you

6    agree?

7    A    That's what I've been told.

8    Q    Okay.  And during the conversation on these jail calls

9    they mention about the requirement that the bonding companies

10   would have for co-signers.  Correct?

11   A    Yes.

12   Q    And again, based on your experience, it's not at all

13   unusual for bonding companies to want co-signers, is it?

14   A    I'm only familiar with Aable and I know they required co-

15   signers.

16   Q    Now in a subsequent jail call you mentioned that

17   Ms. Johnson, that's Dralanjala Johnson who we're talking

18   about, talked about the bonding companies and not able to get

19   with one bonding company and wanting to go with Aable.  Do

20   you --

21   A    Yeah.

22   Q     -- remember that?

23   A    Yes.

24   Q    Okay.  And did my client have any -- my client, Derrick

25   Washington, have any direction or advice or saying, Hey,

1    you've got to go with Aable, you've got to use them, anything
2    like that?
3    A    No, I'm unaware how she came across Aable, but I don't
4    remember him pushing her towards Aable.
5    Q    Now because the jail call notes that you all provided
6    don't have any indication that he was directing or pushing her
7    in that direction.
8    A    Not that I can recall.
9    Q    Okay.  And then also Ms. Johnson in a later jail call
10   talked about check stubs specifically.
11   A    Correct, on several jail calls.
12   Q    Okay.  In a monitored jail call.
13   A    Yes.
14   Q    And did Mr. Washington ask specific questions about the
15   check stubs?
16   A    Not specific questions, he was just on the line
17   wondering -- talking about getting check stubs made.
18   Q    Okay.  And did he -- did Mr. Washington acknowledge or
19   give some sort of assent or consent to say, Hey, we need to be
20   doing something like this?
21   A    Yes, there is a call where -- a previous call there's a
22   gentleman on the phone by the name of Kebel, he had an
23   extremely high bond too, I think it was around a million
24   dollars, and he's on the phone, it's Kebel, Kebel's mom,
25   Dralanjala and Mr. Derrick Washington and that's the first

1    time that Kebel's mom and Kebel mention to Dralanjala, You can

2    make check stubs.

3          Because she's at that point frustrated at how much

4    money that a bonding company wants them to show as far as the

5    co-signers have to make the equal amount which would be

6    $950,000.  So at that point she's frustrated, Kebel and

7    Kebel's mom said, Well, you can make check stubs, and she

8    says, Yeah, I know, and Derrick Washington's on that call.

9          And there's a follow on call where he says, Kebel's

10   mom and Kebel, you know, are going to kind of walk you through

11   that stuff.  And she goes, Yeah, the really high bond stuff,

12   and they don't really go into specifics, but just kind of my

13   knowledge on the bond in the case, they're referring to the

14   conversation before where they're mentioning fake check stubs.

15   Q    What I hear you saying, Special Agent, is that

16   Mr. Washington may have been in on the call, but he did not

17   appear to be leading the discussion.  The discussion that

18   you're talking about was primarily between Ms. Johnson and

19   that other person.  Is that correct?

20   A    There's 2 different calls, so the first -- the first

21   call, it was mainly between Dralanjala, Kebel, Kebel's mom and

22   Mr. Washington was on that call.  The second call it's

23   Mr. Washington, Dralanjala and that's when they talk about the

24   previous call about Kebel, Kebel's mom about them being able

25   to help Dralanjala with the things she needed to do.

1    Q    Okay.  And in all of these jail calls that you've

2    monitored am I correct in assuming that there's never a

3    mention of Mr. Washington saying, Hey, when I get out of jail

4    I'm leaving Texas?

5    A    I don't recall hearing that.

6    Q    Okay.  I'm not fleeing the jurisdiction?

7    A    I don't recall hearing that.

8    Q    Okay.  Thank you.

9            MR. MARTIN:  Pass.

10           THE COURT:  Ms. Pastorini?

11           MS. PASTORINI:  Yes, Judge.  Thank you.

12                           CROSS-EXAMINATION

13   BY MS. PASTORINI:

14   Q    You didn't have any interaction with my client, did you?

15   A    I did not.

16   Q    First of all, do you know who my client is?  It's the

17   gentleman right here to my left.

18   A    Yes, Mr. Calvin.

19   Q    Yes.  Did you have any interaction with him?

20   A    I did not.

21   Q    What about did you ever monitor any jail call, or any

22   call at all with my client on the phone?

23   A    I did not.  This is a case that my co-case would have

24   more knowledge on, but I didn't listen to any jail calls with

25   Calvin.

1    Q    And were you with the team that arrested him?

2    A    I was not.

3    Q    Do you know where he was arrested?

4    A    No, the US Marshals took that arrest, from what I -- I

5    think they said it was maybe under an overpass or something

6    like that.

7    Q    Under a bridge.

8    A    Okay.  Something like that, yes.

9    Q    Where he was -- where he was sleeping and living.  Is

10    that right?

11    A    I'm not sure where he was living, I just know where he

12    may have been arrested at the time.

13    Q    Do you know if it was day or night?

14    A    I would say around north of 06:00 a.m., that's the

15    minimum time that we started conducted arrests, so I would say

16    possibly daylight at that point.

17    Q    Okay.  And you've already said you didn't hear any calls

18    with my client in the --

19    A    Well, I didn't monitor any calls related to this one so.

20    Q    Right.  And you don't know anything about him being

21    involved in any other activity other than the one activity

22    that's alleged in the indictment.

23    A    We only investigated our case where he's involved and we

24    didn't look past whatever's on the indictment.

25    Q    But you didn't stumble on his name or him as a Defendant

1    on any of the other investigations that you had in this

2    matter.

3    A    There's only 1 investigation in this matter for wire

4    fraud, and that's where his name came across.

5    Q    Yeah, there's several -- there were several people

6    involved in this, as you can tell by the --

7    A    Oh, different Defendants.  Okay.

8    Q    Yes.

9    A    No, from what I'm aware he's attached to the James

10   Palladina bond only.

11   Q    All right.

12              MS. PASTORINI:  Pass the witness.

13              THE COURT:  Thank you.

14              Mr. Dees.

15              MR. DEES:  Nothing from me, Your Honor, just

16   argument to proffer.

17              THE COURT:  All right.  So you pass the witness.

18              Any redirect, Mr. Day?

19              MR. DAY:  No, Your Honor.

20              THE COURT:  All right.  You may step down, Agent

21   Hassan.

22         (Witness steps down.)

23              MR. DAY:  No additional evidence.

24              THE COURT:  All right.  Do any of the Defendants

25   have any witnesses to call?

1           MR. DEGEURIN:  Judge, I have -- I have witnesses

2     here but I think I'll do it as a proffer.  Unless the Court --

3     the one that I'm considering calling is his employer.  I have

4     a letter from him.  I'll move -- I'll make it an exhibit and

5     enter it.  I can call him to enter it or I can --

6           THE COURT:  If you're just going to offer it without

7     a witness, do you have any objection to that, Mr. Day?

8           MR. DEGEURIN:  I have a letter.

9           MR. DAY:  No, Your Honor.

10          THE COURT:  All right.

11          MR. DEGEURIN:  I'd like to mark this Exhibit 1.

12          (Wattell Exhibit No. 1 marked for identification.)

13          MR. DEGEURIN:  Defense Exhibit 1 is a letter of

14    employment in support for -- it's an oil recycling business

15    that he works for.  He's kind of -- the employer's here.

16    Judge, if he were to be called, he would state that

17    Mr. Wattell has been employed with him for the last several

18    months in a full time position, that he's a hard worker, that

19    he shows up on time, and even knowing the allegations that are

20    in this indictment, he's willing to continue his employment.

21          I have also in the courtroom, I'd make a proffer of

22    Ms. Angelica Rodriguez -- will you stand -- Mr. Wattell's

23    sister, that if she were called she would testify that she and

24    her brother and siblings all grew up here in Houston, her

25    mother is also a resident here in Houston.  Her mother was not

1    able to be here because she drives trucks.  But that the --

2    all the -- all the siblings live here in Texas.  One lives in

3    Austin and the rest live in Houston.  They all went to high

4    school here in Houston, they grew up here in Houston, all

5    their ties are in Houston.

6         If Mr. Wattell were to be released on pretrial, she

7    would help make sure that he got to all court proceedings,

8    make sure that he got to all lawyer-client meetings, and that

9    she'd be -- she'd be willing to sign to that effect.

10        THE COURT:  Has she interviewed with Pretrial

11   Services?

12        MR. DEGEURIN:  No, she has not been interviewed.

13        I also -- Ms. -- I would proffer Ms. Justine Reed

14   (phonetic), she's here.  Stand up.  Ms. Justine Reed is

15   Mr. Wattell's girlfriend.  You've heard about where -- her in

16   the testimony.  It's her apartment, she's been living in that

17   apartment for six years.  For the last three years Mr. Wattell

18   has been living with her.

19        He has been employed and helps make the payments to

20   the lease, that should would make sure that he -- she's a

21   hairdresser, independently employed hairdresser, but she would

22   help make sure that he gets to court and make sure that he

23   complies with all court orders.

24        In the courtroom I also would proffer Ms. Reed's

25   mother is here.  And her name, I'm sorry, is Ms. Della Prior

1    (phonetic).  She also -- this family of Ms. Reed has been

2    Houston residents, I think they were born in Galveston, but

3    have lived in the Southern District of Texas their entire

4    life.  She also offer -- she is willing to help make sure that

5    he makes all appointments and any court settings.

6          Also I would proffer the testimony of Mr. -- yeah,

7    to say -- I'm trying to remember his last name, Prior, who is

8    the brother of Ms. Reed.  He also has met and knows

9    Mr. Wattell, knows that he's a hard worker, and knows that

10   he -- knows him to be a resident of Harris County and Houston,

11   and would also volunteer to help make sure that he makes any

12   court settings that he needs to.  He's an Uber driver and is

13   significant, would be able to make sure that he has any rides

14   that he needs to get to court.

15         I would also proffer the testimony of Benjamin

16   Ikwuagwt, I-K-W-U-A-G-W-T.  Mr. Ikwuagwt is the brother of

17   Mr. Wattell, he's the one that lives in Austin, he would

18   proffer that he and his family all grew up in Houston,

19   their -- all their ties are here in Houston, that he --

20   they're a close family, that he knows Oscar to be responsible

21   and that he would also help the family in making sure that

22   Oscar Wattell made any court appearances required by the

23   Court.

24         I also have -- I would proffer the testimony of

25   Antonio Wattell, I don't think he made it yet, but he's

1        another brother of -- he's the older brother of Oscar Wattell,

2        he is also a resident here in Houston, that he would testify

3        that the family has always lived here in Houston, all of them

4        went to high school here, they all --

5                THE COURT:  I think it's not the issue of leaving

6        the judicial district, it's appearance.

7                MR. DEGEURIN:  Whether he would --

8                THE COURT:  That's --

9                MR. DEGEURIN:   -- he would --

10               THE COURT:   -- that's what I'm seeing in his

11       Pretrial Services report.

12               MR. DEGEURIN:  But he would make all efforts to make

13       sure Mr. Wattell was able to be in court.

14               Those are the proffers of the testimony.  Judge,

15       what I do have also and -- I have exhibits that would show

16       that -- if the Court is concerned, we're talking about in the

17       Pretrial report where there's a failure to appear on a bunch

18       of different --

19               THE COURT:  Well --

20               MR. DEGEURIN:   -- these are the things that --

21               THE COURT:   -- there are lots of bond forfeitures,

22       lots of failures to appear.

23               MR. DEGEURIN:  Right.  The failure to appear --

24               THE COURT:  And you told me that he was convicted,

25       according to this, October 8, 2018 and then was confined.  But

1          he's got plenty of failures to appear --

2                    MR. DEGEURIN:  Well --

3                    THE COURT:   -- for that confinement.

4                    MR. DEGEURIN:   -- well, I was going to -- I was

5     going to explain to -- and so all those failures to appear

6     which is on -- and it's a cross between argument and proof,

7     but he was in custody on 4/28/18, he was in custody in

8     Montgomery County and I have evidence of that.

9                    THE COURT:  From when to when?

10                   MR. DEGEURIN:  He was in custody starting April 3

11    and this -- I have -- what I have is an affidavit of surety to

12    surrender and that's where a surety says the Defendant is in

13    Montgomery County Jail, showing that he was in custody there

14    in Montgomery County Jail and he was through that time.

15                   I have a motion to continue filed by his attorney on

16    April 24 saying that he's in custody Harris County -- I mean

17    in Montgomery County.  And I also have the warrant by the

18    Court saying that he was taken into custody on the 3rd.  So he

19    was in custody during that period of time.

20                   THE COURT:  When?  From April 3 -- you're telling me

21    he was in custody in Montgomery County from April 3, 2018

22    until when?

23                   MR. DEGEURIN:  Until he was -- until he was brought

24    back to Harris County and which is when he ended up pleading

25    to the different cases in the -- in those offenses, which

1    would be --

2           THE COURT:  All right.  So --

3           MR. DEGEURIN:  And so I also -- Judge, I have --

4           THE COURT:   -- what about the -- what about all the

5    forfeitures --

6           MR. DEGEURIN:  Okay.  Well, the bond -- the

7    surrender which is -- I was trying to allude to it somewhat,

8    there is an affidavit of surrender filed by Sheba Muharib

9    which is a co-Defendant in this case, but it's Aable showing

10   that he was -- that they surrendered the bond because the bond

11   was raised.  I have a document that shows the bond was raised

12   and the -- by the Court.  Aable --

13          THE COURT:  And was it raised because of criminal

14   conduct while on bond?

15          MR. DEGEURIN:  No, the reason why they moved to --

16   Aable requested it be removed.  That's because they're saying

17   that the Defendant failed to follow the bonding company's

18   rules, but not the Court rules.  So in this type of

19   relationship a bonding company, if they don't feel comfortable

20   with the person they're bonding, they can move to surrender at

21   any point.

22          And they moved to surrender.  That is on -- that is

23   on the -- in July of 2018, and that the surrender date there

24   when the Court took it, according to the Pretrial report is

25   August of 2017.  So they filed it and then the bond was

1    surrendered.  He was then re-released on bond.  And then he

2    was in custody on 4/24/18.  That is where 1, 2, 3, 4, 5, 6, 7

3    of the things that say failure to appear was because he was in

4    Montgomery County Jail at that time.

5         What I have these documents to prove is that it's

6    not that he was an absconder or was going out of the

7    jurisdiction.  He was in custody.  Now it could be an issue

8    of, you know, being in custody while on probation, but that's

9    a danger to community, that's not a flight risk.

10        THE COURT:  That is a failure to appear issue --

11        MR. DEGEURIN:  But he was --

12        THE COURT:  -- but he's got -- okay, I think I need

13   to see all that, I need to have Pretrial -- I don't even have

14   the Montgomery County arrest, it's not in the Pretrial

15   Services report.  I've got a conviction for engaging in

16   organized criminal activity in Montgomery County in January --

17   in May of 2018.  But there are failures to appear and bond

18   forfeitures pre-dating this Montgomery County arrest that

19   you're telling me about, Mr. DeGeurin.

20        MR. DEGEURIN:  Well, they're not numbered here, but

21   the 3/7/16, the 4/26/16, the 6/26/16, the 7/27/17, the

22   8/4/17 --

23        THE COURT:  I don't even have all of the ones that

24   you're reading off.

25        MR. DEGEURIN:  -- 9 -- well, these are all on here,

1    they're all saying failure to appear on the very same day

2    which is April 24, 2018, so all the ones that are highlighted

3    that say failure to appear on this -- on 4/24/2018 he was in

4    custody.

5         THE COURT:  But I've also got violation of bond

6    based on new charges.  I mean -- okay, I think I understand

7    your argument.  And I appreciate going through it while you're

8    proffering instead of waiting until the end of the hearing.

9         MR. DEGEURIN:  Well, I'll mark as Exhibit 2 --

10        THE COURT:  Okay.

11        MR. DEGEURIN:   -- what I've just mentioned.

12    (Wattell Exhibit No. 2 marked for identification.)

13        MR. DAY:  No objection, Your Honor.

14        THE COURT:  All right.  That's admitted as Exhibit

15    2.  So Defense Exhibits 1 and 2 have been admitted.

16    (Wattell Exhibit Nos. 1 and 2 received into evidence.)

17        MR. DEGEURIN:  That's all I have as a proffer and

18    evidence.

19        THE COURT:  Thank you.

20        All right.  Mr. Moran (sic).

21        MR. MARTIN:  Judge, on behalf of Derrick Washington

22    the proffer that we would offer would be family and friends

23    are here on both sides of the courtroom, and that they are

24    here to support him.  If the Court would set reasonable

25    conditions on bond, they'll make sure that he appears.

1    They live here in the Houston area and they also

2    have direct knowledge of his living in the Houston area his

3    entire life.  And they would be able to ensure his timely

4    appearance in all court appearances.  That would be our

5    proffer, Judge.

6         THE COURT:  Thank you, Mr. Moran (sic).

7         Ms. Pastorini?

8         I'm sorry, Mr. Martin.  I'm sorry, I keep calling

9    you Mr. Moran.  It's Mr. Martin.

10        Ms. Pastorini?

11        MS. PASTORINI:  Thank you, Your Honor.  I believe

12   with an open active warrant that my client does not qualify, a

13   felony warrant out of Fort Bend County.

14        THE COURT:  All right.

15        MR. DEES:  May I proceed, Your Honor?

16        THE COURT:  Mr. Dees.  Yes.

17        MR. DEES:  Your Honor, I would like to offer several

18   proffers here.  First of all, I would ask that Mr. James Stini

19   please stand up.  Your Honor, Mr. Stini is the vice president

20   of GATE Precasting Company.  He's been at that company for 28

21   years, he is -- that is a very large concrete building company

22   located in the United States and works all around the world.

23        My client, Mr. Rashad Decker (sic), he, in fact,

24   works for that company and has worked there for a year and a

25   half.  He's worked his way up to where he's the second in

84

1    control -- second in authority over quality control.  My

2    client would testify if you -- placed on the witness stand,

3    that he is a hard worker, he often works 6 hours a week, many

4    hours, he makes $23 an hour as best to his recollection.  He's

5    a fine worker and if the Court should see fit to release him,

6    he would immediately have another job to go back to.

7              Also, if I could ask her to stand up, is

8    Ms. Marilyn -- Ms. Marilyn Derrick.  Ms. Marilyn Decker,

9    please sit down, ma'am.  Ms. Decker (sic), she is the mother

10   of my client.  She owns 2 homes, 1 in Harrison County and 1 in

11   Fort Bend County.  And, in fact, the residence at which my

12   client was arrested, the one on -- located on -- in Houston,

13   that was owned by her, in fact, she owns that house outright.

14   He was living there at the time, so he was arrested at his

15   residence.

16             She also owns another home in Fort Bend County which

17   is worth close to $250,000.  Now --

18             THE COURT:  Okay.  Hold on, I've got -- where was he

19   arrested?

20             MR. DEES:  He was arrested at his home on -- I'll

21   give you the actual address, he was arrested at 6601 Sands

22   Point Drive, Number 67, which is a condominium owned by

23   Ms. Derrick, where he was living.

24             THE COURT:  All right.

25             MR. DEES:  And he -- in fact, she says that if the

1    Judge does -- if you do release him, she will be even willing

2    to move into that particular residence because he does have a

3    dog and she thought it might be more convenient if she lived

4    with him there at that location.

5            THE COURT:  Well, what's 1855 Hilton Head Drive?

6            MR. DEES:  That is her home, that's her home in Fort

7    Bend County, that's her home.  She also owns that outright

8    which is $250,000.  And of course she'd find someone to take

9    care of the house during that time.  But she understands that

10   she would need to live with him during that time.

11           She would also testify that he was born in Houston,

12   Texas and attended Elkins High School, graduated, his first

13   year was spent at Annapolis Naval Academy where he played

14   football.  Then he transferred to Arkansas where he went to

15   Southern Arkansas University and obtained a degree in

16   chemistry and biology.  He also in the past has worked 9 years

17   with Shell Oil Company.

18           He did not have a weapon when he was arrested.  He

19   did not threaten anyone.  He was at his residence.  There's an

20   indication he may have had a passport.  He thinks he had a

21   passport at one time but it's long expired and of course it

22   could be turned in if there was a problem.

23           He also has a daughter who's 19 who he's been

24   supporting by paying $300 per month to her while she was in

25   high school.  She's getting ready to attend the University of

1      Central Arkansas and he's anxious to help continue to take

2      care of her.  He also has a small son who's 4 years old, his

3      name's Reese.  He's under obligation to pay -- which he's been

4      paying $100 every week out of his paycheck that goes to

5      support his son.  So he has obligations there.

6           He is not in debt.  Like I say, the 2 homes he lives

7      in are both paid for.  He works sometimes 6 hours a day --

8           THE COURT:  6 hours a day?

9           MR. DEES:  I'm sorry.  I'm sorry, 6 days a week.

10     And sometimes 10 hours -- 10 hours a day.  He had -- a review

11     of his history shows he has no bond forfeitures.  He has no

12     bond forfeitures, he has not failures to appear.  In fact,

13     they noted that he had apparently some kind of either a

14     misdemeanor or some kind of a evading police.  However, it was

15     in Texas and as we all know, they were both dismissed.  As we

16     know, evading arrest can be anything from failing to stop

17     after -- for speeding to a high speed chase, and there's no

18     information about that.  Your Honor, he is working very hard.

19          Also here today is his other sister.  May -- will

20     you please stand up, the other sister?  This is Ms. Kira

21     (phonetic) Derrick.  She is a -- she's a doctor, she's a

22     psychologist with -- is going -- anyway to go to work for one

23     of the school districts here in the Houston area.

24          Another sister, Katrina Derrick, who is an MD, an

25     anesthesiologist, could not be here today because of her being

1    on call.  Also, his girlfriend, Diedre Scrivens, is also here

2    and showing -- to show support.  In other words, he has

3    tremendous, tremendous support here in the community.  He has

4    a very good paying job which he can go right back to.

5        Even the recommendation to -- there's no -- he poses

6    no danger to anyone, he is not a flight risk.  All his

7    connections are here.  In fact, they specifically said, the

8    recommendation set out in Paragraph 7 would fully address the

9    issues of non-appearance and danger to the community.  I think

10   it would be a shame to keep him incarcerated when he's

11   supporting 2 children, helping his daughter get into college

12   and taking --  his mother, who's 70 years old, he needs to

13   take care of her.  He's living -- and she'll be living with

14   him in the -- in 1 of the 2 homes with her, the townhouse,

15   because that's where he can have his dog.

16       But regardless of that he has no history of alcohol

17   abuse or drug abuse.  They talked about drugs, they can't even

18   identify what drug,  if any, illegal drug it was.

19       Your Honor, I would sincerely ask that he be

20   released.  This is not a crime of violence that he's accused

21   of, it's only 1 incident that he's only accused of 3 years ago

22   and we haven't gotten to the bottom of that yet.  So I think

23   he's an extremely good risk to be released and has all the

24   financial and family support backing him to make sure he

25   succeeds in getting to court.  All his friends and relatives

1    here, or his relatives will help him get to court, make sure

2    he gets to court.

3          His mother I believe has also been qualified as a

4    third-party custodian already, and she will -- she

5    understands, I've discussed it with her, that if he does

6    anything that's inappropriate, that it's her obligation to

7    call the court or call the Pretrial Services and let them know

8    that there's a problem.  But we don't anticipate that.  His

9    employer, who's a very, very fine gentleman, has said he's a

10   fine, fine employee and needs him back.

11   Thank you, Judge.

12         THE COURT:  Thank you, Mr. Dees.

13         All right.  I've had semi-argument.  Was there

14   argument from the United States?  And then if there's any

15   follow up, brief, brief arguments if you haven't already had

16   the opportunity to argue for the Defendants.

17         Go ahead, Mr. Day.

18         MR. DAY:  Thank you, Your Honor.

19         Starting with Defendant Number 2, Oscar Wattell, on

20   the Pretrial Services report we can see that he has

21   convictions for credit card abuse, forgery, aggravated robbery

22   with a deadly weapon, engaging in organized criminal activity

23   as well as multiple theft convictions.  The aggravated robbery

24   with a deadly weapon is of particular concern to the

25   Government given the violence involved.

1          Now Mr. DeGeurin spoke about the April 24, 2018

2    failure to appear on that date.  However, from the Pretrial

3    Services report we also see a failure to appear in November of

4    2012, we see a probation violation in December of 2012, we see

5    a bond surrender in August of --

6          THE COURT:  Hold on, I want to get these dates

7    right.  You're starting April 13 of --

8          MR. DAY:  April 20 -- I'm sorry, November 21, 2012

9    is a failure to appear, December 3 of 2012 was a probation

10    violation, August 5 of 2017 was a bond surrender, March 2 of

11    2018 was a violation of bond.  So his violations and failures

12    to appear go well beyond that April 24, 2018 date.

13          Given his history of failing to appear, his history

14    of violating probation and conditions that are given to him,

15    as well as criminal history included the aggravated robbery

16    with a deadly weapon, we are asking for detention as there are

17    no conditions or combinations of conditions that can

18    reasonably assure his appearance or protect the safety of the

19    community.

20          Moving on to Mr. Washington, Mr. Washington has a

21    criminal history that goes back to 1997, he, I counted, 4

22    prior felony convictions including multiple drug trafficking

23    or drug possession related convictions.  He has no assets in

24    his name but he's $73,000 arrears in child support.

25          Perhaps I guess most concerning is at the time of

1    the offense in December 2021 to January '22, at that time he

2    had 5 pending cases, 5 pending cases including possession of a

3    controlled substance, unlawful possession of a firearm by a

4    felon, aggravated assault with a deadly weapon, and aggravated

5    assault with a deadly weapon.  And then from the Pretrial

6    Services report we also see that he's currently non-compliant

7    with reporting for parole.

8         So it's clear he can't follow conditions and based

9    on his criminal history as well as his parole, there are no

10   conditions or combination of conditions that can reasonably

11   assure his appearances in court.

12        Moving on to Mr. Derrick, we can see his criminal

13   history also goes back over 20 some odd years beginning in

14   2002 with a burglary.  He's got a substance abuse act felony

15   where he was given 20 years and 5 years suspended, and that

16   was in Arkansas in 2009.  He has multiple assault convictions

17   in 2017.  He has an unlawful possession of a firearm

18   conviction most recently in 2022.

19        In 2021 at the time he had four assault cases

20   pending that were eventually dismissed, and --

21             THE COURT:  Do you know who those involved?

22             MR. DEES:  Your Honor, I would take -- I would -- as

23   far as the multiple convictions in 2017 those are dismissed,

24   one was reduced to a Class C misdemeanor.

25             THE COURT:  Well --

1          MR. DEES:  I don't think that's an accurate

2     reflection of that record is all, Your Honor.

3          THE COURT:  Hold on.  What I'm interested in knowing

4     is do we know the victim of the 2021 and 2022 assault charges?

5          MR. DAY:  I do not, Your Honor.

6          MR. DEES:  I'm sorry, I believe it's involved -- are

7     you talking about the violation -- the --

8          THE COURT:  The assault of family member.

9          MR. DEES:  I believe that involved a girlfriend at

10    the time, Your Honor, and was dismissed.

11         THE COURT:  Not the current girlfriend?  Is it the

12    current --

13         MR. DEES:  One was dismissed.

14         THE COURT:   -- is the current girlfriend -- is --

15         MR. DEES:  No, it's not -- no, this is not, this is

16    a former girlfriend, Your Honor.

17         THE COURT:  And what about the aggravated assault in

18    2022 and the violation of a protective order?

19         MR. DEES:  That was -- that was dismissed, Your

20    Honor.

21         THE COURT:  I understand, but there was an arrest.

22    What -- who did those involve?

23         MR. DEES:  The same old girlfriend there was

24    apparently during that time.

25         THE COURT:  All right.  You interrupted Mr. Day's

1        argument.

2              MR. DEES:  I'm sorry, Your Honor.  I just wanted to

3        make sure it's correct.

4              MR. DAY:  In addition to his prior criminal history

5        and what we see in the Pretrial Services report this date of

6        arrest is particularly concerning to the Government.  It took

7        this Defendant 2 to 3 hours to come out.  Law enforcement had

8        to escalate this up to a SWAT going in to get him.

9              The danger that he created both to himself as well

10       as to all the members of law enforcement that were involved

11       that day is immeasurable.  It shows that he clearly can't

12       comply with conditions and that he is a danger to the

13       community.  And for that -- those reasons we're asking for

14       detention.

15             THE COURT:  All right.

16             MR. DEGEURIN:  Judge, I still have argument on --

17             THE COURT:  Briefly.

18             MR. DEGEURIN:  First off, I'm sure Mr. Day just

19       misspoke, but Mr. Wattell was not convicted of an aggravated

20       robbery.  He was convicted of a -- of a reduced -- by threat,

21       robbery by threat, so it's not an aggravated robbery.

22             THE COURT:  Hold on.  Hold on.  Are you talking

23       about 2016?

24             MR. DEGEURIN:  I'm talking -- yeah, '17 -- '16.  It

25       was reduced to a by threat, it's not by aggravated robbery

1       with a weapon.   So I just --

2               THE COURT:  Wait --

3               MR. DEGEURIN:   -- want to clarify that, it's -- I

4       think he was reading from the Pretrial report, the Pretrial

5       report's not clear on it, but it was reduced on that.

6               THE COURT:  Okay.

7               MR. DEGEURIN:  I just handed him the judgment of it.

8               THE COURT:  All right.

9               MR. DEGEURIN:  So what I wanted -- what I was trying

10      to make clear, Judge, is that of -- what -- as the Court is

11      looking at whether or not he has failed to appear on

12      something, you look and I see that you see a bunch of these

13      cases saying failed to appear.

14              THE COURT:  I'm going to -- I've drawn a line

15      through every one that's dated April 24, 2018.

16              MR. DEGEURIN:  Okay.  And then also the surrender,

17      the -- and Mr. Day talked about the 8/15/2017, that bond

18      surrender also I also have submitted to the Court was a

19      surrender by the Aable, not based on court violations, but

20      based upon what they thought they wanted him to do, which is

21      usually the not paying --

22              THE COURT:  Well, look right below that, violation

23      of bond based on new charges.

24              MR. DEGEURIN:  Well, but that's their surrender,

25      what they're saying.  They then re-bonded him later.  And so

1      what happens is the bonding companies will come in and will

2      surrender the bond and then re-bond and then --

3              THE COURT:  Are you telling -- are you trying to

4      argue that the violation of bond on August 15 of 2017 based on

5      new charges is inaccurate information?

6              MR. DEGEURIN:  No, there was a bond revocation but

7      he'd had -- they're already surrendered --

8              THE COURT:  Okay.  That's all I need -- that's all I

9      need now.

10             MR. DEGEURIN:   -- they had surrendered the bond

11     prior to that happening.

12             THE COURT:  Okay.  But there was a bond revocation

13     in August of 2017.  Correct?

14             MR. DEGEURIN:  The -- but it was a -- and I provided

15     the Court the paperwork on it.  There was a violation but they

16     raised it based on other -- on it, so there's --

17             THE COURT:  Was his bond revoked because he got new

18     charges?

19             MR. DEGEURIN:  There -- one of them was, yes.

20             THE COURT:  All right.

21             MR. DEGEURIN:  Just one.

22             THE COURT:  All right.

23             MR. DEGEURIN:  In a case like this where we have 51

24     defendants, the length of pretrial delay is much longer, and

25     taking somebody in custody and keeping them in custody on a

1    case that has this many defendants is more punitive than it

2    would be on a case that's a single defendant that would be

3    resolved within 6 months or contemplated by the Speedy Trial

4    Act with 75 days.  This case will likely take years to

5    resolve, and so pretrial detention in this case is much more

6    punitive and just by its nature by this many defendants.

7             So I'd ask the Court to consider the fact that -- a

8    couple of things.  One, since he's been out of custody in 2018

9    he hasn't had any issues.  Since the investigators went and

10   told Aable and closed down Aable where Mr. Wattell was

11   employed, there is nothing further from that period of time.

12   I think the agent said 2022.

13            But once Aable was closed down there is no

14   allegations from 2022 to 2024.  There is no allegations of

15   criminal activity, there's no allegations that Mr. Wattell had

16   anything to do with the bonding industry after that.  And when

17   they went and looked for him in 2021 to talk to him, and they

18   go look for him in 2024, he's exactly where they expected to

19   find him.  He's not a flight risk.  He's not a flight risk.

20            Now I understand the Court's concern over having

21   been roped on other cases earlier.  However, we're talking

22   about a different verb and when you're dealing with federal

23   probation and federal pretrial where he could -- I'd ask the

24   Court to ask -- I would say with electronic monitoring and

25   with meetings with the Pretrial officers, that conditions can

1    be set that would ensure that Mr. Wattell would appear for any

2    orders of the Court to show up for trial.

3            Which, like I've explained it, Judge, when a case

4    like this which will clearly be considered complex clearly it

5    will take if not a year to a couple of years to be resolved,

6    that releasing him on pretrial release is the right thing, and

7    I ask the Court to set bond for Mr. Wattell.

8            THE COURT:  Thank you, Mr. DeGeurin.

9            MR. MARTIN:  Judge, with regard to Mr. Washington, I

10   respectfully draw distinction with the Government's

11   characterization of his criminal record.  Charges from 2018

12   through 2021 they were all dismissed per the Pretrial Services

13   report.  That's on Page 4.

14           THE COURT:  I see.

15           MR. MARTIN:  And my client is, as you well know,

16   he's entitled to a presumption of innocence.  The State of

17   Texas through its district attorney in Harris County, they

18   dismissed those 4 charges.

19           Also, my client's criminal record that the

20   Government wants to make much about there's quite an element

21   of remoteness to it.  It goes back 20-22 years with the

22   exception of the one in 2018 for which he was on -- currently

23   on parole.

24           THE COURT:  What I'm concerned about with respect to

25   your client is his failure to comply with his existing -- or

1    with his -- he failed to comply with his reporting

2    requirements for parole.

3           MR. MARTIN:  I was going to get to that in just a

4    moment.  My client does not know Tanya Williams, my client's

5    parole officer was Jay Daniels.  He's never met with Tanya

6    Williams, and had met with Jay Daniels, who was his parole

7    officer.

8           THE COURT:  This is the person that was contacted by

9    Pretrial Services to get information about his compliance with

10   his parole, they have records, Tanya Wilson (sic) is the

11   person that they spoke to, and he is not compliant with his

12   parole requirements.

13          MR. MARTIN:  All I can share with you is what I

14   understand from my client, Judge.

15          THE COURT:  All right.

16          MR. MARTIN:  Then also I'd ask that you take into

17   consideration he's a lifetime resident of the Houston, Harris

18   County area.  All of his life is here, he's got employment

19   here, family who has showed up to support him, and he does

20   have the ability to make court appearances, and they can help

21   him make the court appearances.

22          Also I believe the Court does have the ability to

23   have reasonable conditions, a GPS monitor, an electronic

24   monitor.  Also could have frequent visits with the Pretrial

25   Services officer.

1          And then finally, Judge, the Government has made no

2    mention whatsoever of my client being a flight risk, or of

3    his -- any intention to flee the jurisdiction.

4          THE COURT:  Well, it's a serious risk of flight or

5    non-appearance.

6          MR. MARTIN:  That's it, Judge.  Thank you.

7          THE COURT:  All right.  Thank you.  All right.

8          MS. ORPHE:  Your Honor?

9          THE COURT:  Yes.

10          MS. ORPHE:  Regarding Mr. Rashad Derrick, I just

11    wanted to let you know that I told the Harris County the last

12    two assault cases.

13          THE COURT:  Yes.

14          MS. ORPHE:  It appears that they've been saying

15    (indiscernible) and I believe that's the girlfriend that is

16    currently in the audience.

17          THE COURT:  All right.

18          MR. DEES:  Your Honor, I couldn't quite hear that.

19    This is all new to me.

20          MS. ORPHE:  I just want to make sure that's not the

21    old girlfriend that he's living with.

22          THE COURT:  Who is -- who is the girlfriend who's

23    here in the audience?

24          UNIDENTIFIED SPEAKER:  Mr. Scrivens.

25          MS. SCRIVENS:  My name is Diedre.

1          THE COURT:  Diedre?

2          MS. SCRIVENS:  Scrivens.

3          MR. DEES:  Scrivens, Your Honor.

4          THE COURT:  Scrivens.  All right.  Thank you.

5          MS. ORPHE:  Thank you, Your Honor.

6          THE COURT:  All right.  I'm going to start with --

7     well, first of all, Mr. Skrivanek is detained.  His hearing

8     was essentially passed but he is on -- he has a current --

9     even if that had not been the case, he has a current active

10    warrant for his arrest, he's got multiple adjudications of

11    probation so that shows me he has failed to comply with

12    probation and other Court conditions in the past.

13         He's had bond revocations and motions to adjudicate

14    guilt for deferred adjudication.  He also has no appropriate

15    place to reside, so he is detained and he will be remanded to

16    the custody of the US Marshals.

17         With respect to Mr. Derrick, here's what I'm going

18    to do with Mr. Derrick.  At this time I'm going to detain him

19    based on his failure to comply with probation or parole.  If

20    you find, Counsel, that that information that was given to the

21    Court by Tanya Williams is not correct, you can file a motion

22    to reopen.  If he has been compliant, that would be something

23    that I would consider.

24         There are other issues that concern me with his

25    history, but as you mentioned, he doesn't have any

1    revocations, prior bond revocations or failures to appear.  He

2    does have a failure to comply with instructions, and when I

3    see someone failing to comply with some other Court's

4    instructions, that tells me they're not going to comply with

5    my instructions.

6            So I'm detaining Mr. Derrick and with the

7    understanding that if that information is -- the information I

8    have taken judicial notice of is not correct, you can file a

9    motion to reopen.

10           And let me just say with respect to all Defendants

11   that I'm detaining, if Mr. DeGeurin's argument turns out to be

12   accurate, that this case goes on for an extended period of

13   time, you can always file a motion to reopen.  I don't know

14   what the guideline sentences are for these offenses.

15           But I understand your argument, Mr. Deguerin.  I

16   don't think that that's something that I can necessarily make

17   a determination on today.

18           With respect to Mr. Wattell, even if I disregard the

19   multiple failures to appear that are in the Pretrial Services

20   report as occurring on April 24 of 2018, I have multiple

21   instances of bond violations, failures to appear, bond

22   revocations, a long criminal history, and again, motions to

23   adjudicate when on deferred adjudication.

24           It's not that I believe Mr. Wattell is going to flee

25   the jurisdiction, it's the fact that I don't -- when he

1    doesn't follow other Court's conditions or other bond

2    conditions, I have no confidence that he's going to follow any

3    conditions that I set, whether it be GPS or anything else.

4    And getting a bond revoked for new charges is exactly the type

5    of thing that tells me someone is not following their

6    conditions that they've been released on.

7              Again, if there's other information that shows these

8    bond revocations and these failures to appear that are not

9    April 24 of 2018 are inaccurate, I'd be willing to hear that

10   in a motion t reopen detention.

11             MR. DEES:  Your Honor, may I -- may I be heard?  I'm

12   a little confused because there's a Mr. Derrick, there's a

13   Derrick Washington and there's --

14             THE COURT:  I haven't --

15             MR. DEES:   -- my client's Derrick.

16             THE COURT:   -- I haven't got -- hold on --

17             MR. DEES:  So Mr. -- could he --

18             THE COURT:   -- didn't I do Derrick Washington?  I

19   did Derrick Washington already.

20             MR. DEES:  Okay.  I'm sorry.  You had said Derrick

21   and I was confused.  Thank you, Judge.

22             THE COURT:  Derrick Washington.

23             All right.  So at this time I'm remanding

24   Mr. Wattell to the custody of the Marshals.  I will issue

25   written orders on al of these later today.

1          All right.  With respect to Mr. Rashad.  May I ask

2     the gentleman in the audience who is here as his employer, are

3     you still intending to employ Mr. Rashad if he's released --

4     Mr. Derrick -- Mr. Rashad Derrick if he is released?

5          UNIDENTIFIED SPEAKER:  Absolutely, yes.  Yes, ma'am.

6          THE COURT:  All right.  All right.  I'm willing to

7     give Mr. Rashad Derrick an opportunity to be on bond.  I will

8     set bond conditions.  He's going to require a third-party

9     custodian and several other conditions, and we can go over

10    those in a moment.  I'm going to let the Marshals take the

11    other 3 Defendants who have been detained upstairs, and I'll

12    need counsel for Mr. Rashad Derrick and the United States and

13    Mr. Rashad Derrick at the bench.

14         UNIDENTIFIED SPEAKER:  So the rest of us can be

15    excused then?

16         THE COURT:  You may.  You may.

17       (Pause in the proceedings.)

18         THE COURT:  All right.  Mr. Derrick, the one issue

19    that I have is I -- there seems to be conflicting information

20    in your bond report, so I'm just going to tell you this today.

21    Bond is for people who are truthful, who report, who do what

22    they're supposed to do and are always truthful with their

23    supervising officer.

24         DEFENDANT DERRICK:  Yes, ma'am.

25         THE COURT:  If that doesn't happen, you're going to

1     end up getting your bond revoked.

2                     DEFENDANT DERRICK:  Yes, ma'am.

3                     THE COURT:  I need to have your mother come forward.

4                     MR. DEES:  Ms. Derrick, please come forward.  Mother

5     Derrick.  The Judge has some questions for you.

6                     MS. DERRICK:  Okay.

7                     THE COURT:  All right.  Ms. Derrick, you're going to

8     be required to be a third-party custodian of your son.  Do you

9     understand what that means?

10                    MS. DERRICK:  Yes, ma'am.

11                    THE COURT:  And it means you're responsible for

12    informing on him if he fails to comply with any of the

13    conditions that get set.

14                    MS. DERRICK:  Yes, ma'am.

15                    THE COURT:  All right.  And you're willing to take

16    on that responsibility?

17                    MS. DERRICK:  Yes, ma'am.

18                    THE COURT:  All right.  I need everybody else in the

19    courtroom to be quiet, please.

20                    All right.  You may not violate any federal, state

21    or local laws while on conditions of release.  You must appear

22    for all of your court appearances.  You may not change your

23    address or phone number without providing in writing advanced

24    notice to your Pretrial Services officer.

25                    As long as your mother is residing with you, you all

1    can reside at either the 1859 Hilton Head Drive or at the 6601

2    Sands Point Drive, but you must reside with him.

3            MS. DERRICK:  Yes.

4            THE COURT:  You're going to execute a $50,000

5    unsecured bond.  You do not have to pay the $50,000 now, but

6    you are signing bond paperwork obligating yourself as

7    responsible for the $50,000 bond if it is revoked or

8    forfeited.  The United States can get a money judgment against

9    you in the amount of $50,000.  Do you understand that?

10           DEFENDANT DERRICK:  Yes, ma'am.

11           THE COURT:  And, Ms. Derrick, you are going to -- is

12   Pretrial recommending either a third-party custodian or a co-

13   surety?  Or is it -- or both?

14           MS. ORPHE:  It looks like we're requiring both.

15           THE COURT:  All right.  Are you willing to sign as a

16   co-surety on the bond?

17           MS. DERRICK:  (No audible response.)

18           THE COURT:  All right.  You will be a third-party

19   custodian and a co-signer on the bond.

20               You'll be subject to Pretrial Services supervision.

21   You're going to be required to undergo any drug testing and in

22   the event that Pretrial Services decide you need it, you will

23   have to take any courses or undergo any treatment that they

24   recommend.  You must refrain from using or possessing any

25   narcotic drug or controlled substance unless it's prescribed

1    to you by a licensed medical practitioner, that includes CBD

2    products or any items marketed as containing CBD.

3          You must maintain your full time verifiable

4    employment with GATE Precast.  You have to surrender your

5    passport.  Your travel is restricted to Harris County and the

6    counties that touch Harris County.  Do you need to leave any

7    of the counties that touch Harris County for your work?

8          DEFENDANT DERRICK:  No, ma'am.

9          THE COURT:  All right.  Avoid all contact with any

10   co-defendant, victim, witness, potential witness in this case.

11   There are 53 people charged, you cannot have any contact with

12   any of them.  Understood?

13         DEFENDANT DERRICK:  May I speak?  I work in

14   Pearland, I believe it's Brazoria County.

15         THE COURT:  But that touches Harris County.

16         DEFENDANT DERRICK:  Okay.  Yes, ma'am.  Yes, ma'am.

17         THE COURT:  And if it doesn't, then --

18         MR. DEES:  I believe it does, Your Honor.

19         THE COURT:  Okay.

20         MR. DEES:  It's very close.

21         THE COURT:  All right.  You're definitely allowed to

22   be in the county where you are employed.

23         Refrain from possessing a firearm, destructive

24   device or other dangerous weapon.  Are any of the firearms

25   that were at your home going to be removed?  Is there someone

1    to remove them before you return home?

2              DEFENDANT DERRICK:  I don't have any.

3              THE COURT:  No firearms?

4              DEFENDANT DERRICK:  No.

5              THE COURT:  All right.  If you have any contact with

6    law enforcement, you must let your supervising officer know

7    within 72 hours and the failure to do that is a violation.

8    That means if you're driving down the road, you get pulled

9    over and you do not receive a ticket, that's still contact

10   with law enforcement that has to be reported.

11             DEFENDANT DERRICK:  Yes, ma'am.

12             THE COURT:  Understood?  All right.  I've mentioned

13   no communication with any co-defendants.  I think that's it.

14             DEFENDANT DERRICK:  Yes, ma'am.

15             THE COURT:  There are severe -- you understand the

16   conditions?

17             DEFENDANT DERRICK:  Yes, ma'am.

18             THE COURT:  There are severe consequences for

19   failing to comply with the conditions of release.  If you fail

20   to comply with any of the conditions, a warrant can be issued

21   for your arrest, your bond can be revoked, you can be held in

22   custody until the time of your trial.  And as I mentioned, the

23   bond can be forfeited and the United States can get a money

24   judgment against you and your mother in the amount of $50,000.

25             It is a crime punishable at 5 to 10 years in prison

1       and a fine of up to $250,000 or both to obstruct a criminal

2       investigation or to attempt to influence or tamper with a

3       witness, informant or victim.  That's why you cannot have any

4       contact with anyone involved in the case, including co-

5       defendants.

6            If you commit a federal felony while on release,

7       you're subject to an additional term of imprisonment of up to

8       10 years and a fine of up to $250,000.  Any additional prison

9       sentence would not begin to run until after the underlying

10      sentence has been completed.

11           If you fail to appear for court appearances or if

12      you are convicted and you fail to surrender to serve the

13      sentence, you can receive an additional term in prison of up

14      to 10 years.  Again, it would not begin to run until after the

15      underlying conviction has been completed.

16           If you are found not guilty on the charge, or these

17      charges, and if you are convicted and you surrender to serve

18      the charge -- the sentence that is imposed, your bond will be

19      released.  Any questions?

20           DEFENDANT DERRICK:  No, ma'am.  Thank you.

21           THE COURT:  All right.  Any questions, ma'am?

22           MS. DERRICK:  No, ma'am.

23           THE COURT:  All right.

24           MR. DEES:  Thank you, Your Honor.

25           THE COURT:  You're all excused.

1          MR. DEES:  Appreciate it, Crista.

2          MS. DERRICK:  Thank you.

3          DEFENDANT DERRICK:  Thank you.

4          MR. DAY:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6       (Hearing adjourned 12:22 p.m.)

7                    *  *  *  *  *

8          *I certify that the foregoing is a correct transcript*

9    *to the best of my ability produced from the electronic sound*

10   *recording of the proceedings in the above-entitled matter.*

11      */S/  MARY D. HENRY*

12   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

13   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

14   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

15   *JTT TRANSCRIPT #69123*

16   *DATE FILED:  OCTOBER 4, 2024*

17

18

19

20

21

22

23

24

25